Stephen T. BURNS et al., Appellants,

v.

CITY OF DES PERES et al., Appellees.

No. 75–1466.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 8, 1976.

Decided April 14, 1976.

Marvin S. Wood, St. Louis, Mo., for appellants; Ellsworth Cundiff, St. Charles, Mo., filed brief.

Sullivan & Evans, P. C., St. Louis, Mo., for appellees; James L. Sullivan and Stephen W. Woodard, St. Louis, Mo., and Robert C. Jones, Clayton, Mo., filed brief.

Harold A. Tzinberg, Clayton, Mo., filed brief of amicus curiae, St. Louis County Municipal League.

Before GIBSON, Chief Judge, BRIGHT, Circuit Judge, and VAN PELT, Senior District Judge.*

GIBSON, Chief Judge.

Plaintiff, Stephen T. Burns,[1] appeals from the District Court's[2] granting of a motion for judgment notwithstanding the verdict in favor of three individual defendants—Steve Tapper, Edward Smith and Scott Styles. The remaining 21 defendants were either dismissed prior to trial or were exculpated by a jury verdict in their favor.

The defendant City of Des Peres is a small community of approximately 5,000 persons which is within the suburban reaches of St. Louis, Missouri. As an expanding community in the early 1950's, Des Peres annexed a rather large portion of land to the north of the city. Burns' property, comprised of 4.11 acres, is contained in this annexed portion.

In order to promote a more orderly and structured development of the property within its borders, Des Peres promulgated zoning ordinances as permitted by Missouri law. Mo.Rev.Stat. § 89.020 (1969). There are four ordinances which are relevant to our inquiry in this case.

Ordinance # 23 was enacted on January 9, 1949, and established, *inter alia,* two residential zoning classifications:

"A" Single Family Dwelling—requiring lots of at least 43,560 square feet (one acre) with an average width of 150 feet;[3] and

"B" Single Family Dwelling—requiring lots of at least 15,000 square feet with an average width of 100 feet or more.

All of the newly annexed property in Des Peres was zoned "A" classification pursuant to Ordinance # 23.

Ordinance # 206 was adopted on December 28, 1959, as an amendment to Ordinance # 23. In general, Ordinance # 206 created additional residential and commercial zoning classifications. The one-acre lot size for "A" residential zones was retained but the minimum lot for "B" districts was increased from 15,000 to 17,500 square feet. Ordinance # 206 also made comprehensive provisions for nonconforming uses.

Ordinance # 209 was promulgated on May 9, 1960, and established an "AA" Single Family Dwelling classification. The ordinance required "AA" districts to maintain lots averaging 37,000 square feet with no single lot being less than 30,000 square feet. The frontage of all subdivision lots in this district was to average 150 feet per lot. The "AA" lot sizes were a reasonable accommodation between the large "A" district lots and the smaller "B" district lots.

Ordinance # 244 was adopted on September 11, 1961, and created the "Density Development Procedure". This procedure was intended to alleviate the problems arising from the development of certain areas where substantial topographical alterations would be required in order to develop the property in strict conformance with existing zoning ordinances. The city officials concluded that the removal of top soil, trees and other natural objects would tend to destroy many of the aesthetic aspects of the community. This ordinance provided that, in lieu of requiring such destruction, the developer could merely reduce his lot sizes to mitigate unnecessary destruction of natural objects and preserve the rustic atmosphere of the area to the extent possible. The ordinance, while not allowing an increase in the number of lots in a particular zoning classification, permitted a developer to reduce the lot size to the next lowest zoning classification.

The Burns' property, which is the subject of this litigation, is comprised of three ad-

---

* The Honorable Robert Van Pelt, United States Senior District Judge for the District of Nebraska, sitting by designation.

1. Also joined as a party in this case is Stephen Burns' wife, Edna. For the sake of convenience we will refer to Burns in the singular.

2. The Honorable James H. Meredith, Chief Judge, United States District Court for the Eastern District of Missouri.

3. If no sewage disposal system was available the lots could not be less than three acres with an average width of 300 feet.

joining tracts of land located in the "A" district zoning classification. Two of the tracts are approximately 75 feet by 670 feet; the third tract is 120 feet by 670 feet. On March 1, 1967, Burns initiated proceedings to obtain administrative relief from the "A" district classification. On that date, he submitted a plat to the Des Peres Planning and Zoning Commission (Commission) for approval. The plat proposed a 10-lot subdivision with a minimum lot size of 15,000 square feet. The Commission rejected the plat on the basis that it failed to comply with Ordinance # 206. The apparent reason is that the lot sizes proposed on the plat were substantially smaller than the 43,560 square feet lots required in "A" districts.

Burns submitted a new plat to the Commission on April 18, 1967. This revised plat established an 8-lot subdivision with a minimum lot size of 17,500 square feet. The Commission refused to hold a public hearing on the question of whether the plat should be approved and informed Burns that a petition for change in zoning would have to be filed. Thereafter, Burns petitioned the Commission to change his zoning classification from "A" district to "B" district. This petition was approved by the Commission on June 7, 1967, after a public hearing.

The Commission's favorable recommendation was forwarded to the Des Peres Board of Aldermen which had previously received a petition for rezoning Burns' property to "B" district. After a public hearing the Board of Aldermen unanimously denied Burns' rezoning request on August 14, 1967. Defendants Tapper, Smith and Styles voted to deny the request. It is the denial of this request by the Board of Aldermen which has spawned the instant litigation.

After the Board of Aldermen rejected his rezoning request, Burns persisted in his efforts to seek relief from "A" district restrictions. He requested the Des Peres Board of Adjustment to approve a resubdivision of

the property into eight lots. The Board of Adjustment ruled that the matter was beyond its jurisdiction and refused to act on Burns' request. Burns then petitioned for a writ of certiorari against the Board of Adjustment in the circuit court of St. Louis County, Missouri, to force the Board to rule on his request. The court concluded that the Board of Adjustment had no jurisdiction to entertain a request for resubdivision and dismissed Burns' petition.

On June 12, 1969, Burns filed another petition in the circuit court of St. Louis County seeking a declaratory judgment that Ordinance # 206 is invalid as applied to the Burns' property. Burns named members of the Board of Aldermen and other city officials, some of whom are defendants in the present suit, as defendants in the state court action. That case is still pending in the state courts.

In October, 1973, the present action was instituted by Burns against the City of Des Peres and 23 individual defendants who were elected or appointed officials of the city. This action is basically premised upon 42 U.S.C. § 1983 (1970) and the Fourteenth Amendment.[4] Burns contends that he was denied due process and equal protection of the law because of defendants' failure to rezone his property. He seeks a recovery of $1,135,000 in compensatory and punitive damages. The City of Des Peres and five individual defendants were dismissed pursuant to pretrial motions for summary judgment and the case proceeded to trial with 18 individual defendants. The jury returned a verdict against defendants Tapper, Smith and Styles for $6,000. The District Court granted defendants' motion for judgment notwithstanding the verdict, finding no evidentiary basis for the verdict. Burns' first assignment of error on this appeal is that the District Court improperly granted this motion.

At the outset, it is necessary to carefully circumscribe the scope of our inquiry in regard to this allegedly erroneous ruling on

4. The complaint also stated claims for recovery pursuant to 42 U.S.C. §§ 1985(3), 3601–31 (1970), as amended, 42 U.S.C. §§ 3604–06 (Supp. IV, 1974). The District Court dismissed these claims prior to trial.

defendants' motion. We are concerned only with the activities of defendants Tapper, Smith and Styles during the course of their membership on the Des Peres Board of Aldermen. Tapper served as Alderman from April, 1967, to April, 1971; Smith served from June, 1967, to April, 1970; Styles served from April, 1964, to April, 1968. The activities of the other individual defendants and any official action by the Board of Aldermen subsequent to the tenure of these defendants are relevant only to the extent that they may reflect on the purpose or motivation for these three defendants' actions during their aldermanic tenure.

■ The scope of judicial review is also limited by the nature of this case. When an individual contends that a municipal commission has unconstitutionally applied a zoning ordinance to his property, courts are not entitled to review the evidence and reverse the commission merely because a contrary result may be permissible. Courts are not to assume the role of a "super zoning board". *Steel Hill Development, Inc. v. Town of Sanbornton*, 469 F.2d 956, 960 (1st Cir. 1972); *see Village of Belle Terre v. Boraas*, 416 U.S. 1, 13, 94 S.Ct. 1536, 1543, 39 L.Ed.2d 797, 806–07 (1974) (Marshall, J., dissenting). A decision not to rezone a particular tract is vested in the discretion of the proper municipal zoning authorities and their legislative decisions are not to be subjected to court scrutiny to determine whether their refusal was expedient or provident. *See Geneva Investment Co. v. City of St. Louis*, 87 F.2d 83 (8th Cir.), *cert. denied*, 301 U.S. 692, 57 S.Ct. 795, 81 L.Ed. 1348 (1937); *Strandberg v. Kansas City*, 415 S.W.2d 737, 746 (Mo.1967). Our function in this type of case is to ascertain whether there has been a transgression upon the property owner's constitutional rights. *McMahon v. City of Dubuque*, 255 F.2d 154, 160 (8th Cir.), *cert. denied*, 358 U.S. 833, 79 S.Ct. 53, 3 L.Ed.2d 70 (1958). In order to support his constitutional claims the plaintiff is required to prove that the defendants' actions were clearly arbitrary,

unreasonable and discriminatory and bore no substantial relation to the health, safety, convenience and welfare of the community. *McMahon v. City of Dubuque, supra* at 160; *Dennis v. Village of Tonka Bay*, 156 F.2d 672, 674–75 (8th Cir. 1946); *see Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303, 313–14 (1926).

Burns has attempted to develop two theories to support his claim that these defendants infringed upon his due process and equal protection rights: (1) all property in the immediate vicinity of the Burns' property has been developed pursuant to "B" district specifications, thus Burns was entitled to have his property rezoned to "B" district; and (2) Burns' property constituted a nonconforming use and the provisions of Ordinance 206 permitted nonconforming uses to be changed to "B" district uses.

To support his first theory Burns adduced evidence purporting to show that much of the property proximate to his had either been zoned "B" district or had been developed pursuant to "B" district specifications despite different zoning classifications. The defendants contend that to grant Burns' request for rezoning would have changed the zoning classification in the area and would have encouraged an influx of rezoning requests from other property owners who desired more intensive residential uses.

■ The resolution of this issue requires an understanding of the various zoning classifications and uses in Burns' neighborhood. In assessing whether Burns has been discriminatorily treated, it is necessary to compare similarly situated properties in the area and determine if Burns has been treated disparately and, if so, whether reasonable grounds exist for the disparate treatment. *See Lewis v. District of Columbia*, 89 U.S.App.D.C. 72, 190 F.2d 25, 28 (1951).

Immediately to the east and contiguous to the Burns' property is a development characterized as Gray Estates which has been developed in two subdivisions pursu-

ant to two separate plats. The first plat was approved on August 13, 1962, and was accorded an "AA" zoning classification. There is substantial evidence in the record to support defendants' contention that this property was developed in accordance with Ordinance # 244, the density development procedure. On February 28, 1968, six months after the Board of Aldermen denied Burns' request for rezoning from "A" to "B" district, the second plat for Gray Estates was presented to the Des Peres Planning and Zoning Commission accompanied with a request to rezone from "A" to "B" district. This request was denied. A revised plat was submitted which established "AA" district lot sizes and which proposed that the property be developed pursuant to the density development procedure. This second plat was approved by the Board of Aldermen on February 23, 1970. While a few of the lots in the Gray Estates subdivision were slightly smaller than the 30,000 square feet minimum required in "AA" districts, the variation is justified due to the density development procedure. In any event, all the lots were substantially larger than the 17,500 square feet lots sought by Burns.

To the south of the Burns' property are the Lynn Acre Kennels. This tract has been used as a dog kennel since approximately 1945 and has been permitted to continue as such pursuant to the nonconforming use provisions of the Des Peres ordinances.

Also to the south of the Burns' property is the Royal Estates subdivision which is zoned "A" district. Two of the four lots in Royal Estates satisfy the one-acre lot size requirement for "A" zones. Since the other two lots were slightly less than one acre, the developer obtained a variance from the city to permit development pursuant to "A" district specifications. It is notable that, although Burns' property and Royal Estates each approximate four acres in size, Royal Estates has been developed in four lots while the Burns' rezoning request contemplated eight lots.

Further to the south of Burns' property appear the coterminous subdivisions of Andre Drive and Briarbrook Trail. These subdivisions are located in the "A" district zoning classification and the plats for these developments were approved over 20 years ago. It was ascertained at trial that a small percentage of the lots in these subdivisions were slightly smaller than the required one acre. The testimony indicates that the plats were not as thoroughly checked and surveyed during that period of time. Furthermore, the fact that a few of the lots were negligibly smaller than 43,560 square feet would not automatically entitle Burns to have his property downzoned two zoning classifications to permit 17,500 square feet lots.

Somewhat removed from the Burns' property to the south and east are four subdivisions which were rezoned to "B" district prior to the adoption of Ordinance # 206 in 1959. We consider these subdivisions to be too remote to be classified in the immediate vicinity of the Burns' property. Directly to the west of the Burns' property is an undeveloped tract of land. To the north are a number of small 6,000 square feet lots located in the City of Crystal Lake.

■ Burns contends that the zoning classifications and uses in his immediate community, described above, require his property to be rezoned to "B" district and that the defendants violated his constitutional rights by refusing to grant him the rezoning. We disagree. No subdivision in the immediate vicinity of the Burns' property has been zoned as "B" district. The developers of these tracts either developed the tracts in conformance with "A" district requirements, received variances from "A" district restrictions or rezoned to "AA" district and developed pursuant to the density development procedure. While a small percentage of the lots were slightly smaller than the required size, valid justifications have been advanced to explain the variance. None of the lots in the immediate area even approximated the small 17,500 square feet lots sought by Burns. While the defendants may have been obligated to consider zoning

classifications in adjoining municipalities, *cf. Huttig v. City of Richmond Heights,* 372 S.W.2d 833, 842 (Mo.1963), we cannot say that defendants violated Burns' constitutional rights by adhering to the Des Peres zoning scheme and not reducing lot sizes to approach the small lots of Crystal Lake.

Defendants' refusal to rezone Burns' property is further supported by the fact that several persons, including various property owners in the area, voiced objections to the rezoning at a public hearing. Property owners in the area who have relied on the existing zoning classification have an interest in the perpetuation of such scheme unless the public good dictates a change. *Allen v. Coffel,* 488 S.W.2d 671, 678–79 (Mo.App.1972). The defendants were entitled to consider these objections in ruling on Burns' request for rezoning. The evidence in this case shows that defendants' decision not to rezone Burns' property was not arbitrary, unreasonable or discriminatory.[5]

Burns' second theory is premised upon his conviction that his property constitutes a nonconforming use since it fails to comply with the frontage requirements for "A" districts. Ordinance # 206 requires "A" district lots to maintain a frontage of 150 feet. Burns' three parcels of land have frontages of approximately 70 feet, 75 feet and 120 feet respectively. Burns argues that, at the time of his request, Ordinance # 206 provided that nonconforming uses could be changed to any use permitted in a "C–1" district and that "B" district uses were permitted in "C–1" districts.[6] Consequently, defendants were obligated to grant Burns' request for "B" district zoning.

Initially, there is nothing in the record to indicate that Burns mentioned or relied upon any nonconforming use provisions when he presented his petition for rezoning to the Board of Aldermen. The Board was concerned only with whether Burns had proved that he was entitled to have his property rezoned to "B" district. The Board was not requested to consider, nor did it have the occasion to discuss, whether the Burns' property constituted a nonconforming use and whether the existing ordinances permitted "B" district specifications on the property.

In addition, there is some question in the record as to whether there was any reliance on the nonconforming use provisions at all by Burns. When Burns was seeking resubdivision of his property before the Board of Adjustment subsequent to the defendants' refusal to rezone his property, his attorney told the Board the following:

> For the record, if I might add, Mr. Chairman, this is not a nonconforming use, because the use is residential under our request and the use is residential under the zoning ordinance. So we are not requesting a nonconforming use, merely

5. Although defendants rejected Burns' request for rezoning, it is notable that Burns possessed less extreme, unpursued alternatives. He has never sought a variance to permit relief from the "A" district frontage requirements. *Rosedale-Skinker Improvement Ass'n v. Board of Adjustment,* 425 S.W.2d 929 (Mo.1968). Burns has never sought rezoning into the next lowest zoning classification, "AA", and has never requested permission to develop his property pursuant to the density development procedure. Burns has adamantly attempted to have his property downzoned two zoning classifications.

6. On January 27, 1969, the Board of Aldermen passed Ordinance # 412 which was a comprehensive revision of the permissible uses available in "C–1" districts. The general purpose of the ordinance was to restrict the proliferation of gasoline stations, fast food restaurants and other similar businesses in certain portions of the city. The ordinance also removed "B" district uses from the list of permissible uses in a "C–1" district. Burns contends that this excision of "B" district uses was specifically directed against him and was adopted to prevent him from applying the nonconforming use provisions to his land. Defendants Tapper and Smith were members of the Board of Aldermen when Ordinance # 412 was adopted. Contrary to Burns' charges, we find nothing in the record to indicate that Ordinance # 412 was in any way intended to adversely affect Burns individually. The ordinance was promulgated for valid municipal purposes and was intended to remedy a particular problem in the community. This legislative enactment is not subject to attack under the facts of the instant case.

that a variance be granted so that the lot size can be maintained.

While Burns later expressed his own view that the property was nonconforming, it appears from the record that Burns' nonconforming use theory was not developed until after the Board of Aldermen denied the request for rezoning in 1967. At no time after 1967 did defendants Tapper, Smith and Styles have the opportunity to review another Burns' request for zoning relief since Burns' court actions were pending during the balance of their tenure on the Board of Aldermen.

■■■■ Burns has little cause to complain that his *post hoc* nonconforming use theory has been unavailing. If he had determined that the theory was meritorious, he should have presented it to the Board of Aldermen so that a full consideration could have been given to the matter. A complete development of the facts on this issue is important since there is some dispute between the parties and considerable doubt regarding whether Burns' property actually constitutes a nonconforming use within the

letter and spirit of the Des Peres zoning ordinance.[7]

■■■■ Our review of the record indicates that defendants considered Burns' rezoning request fairly and with impartiality. We cannot attribute any discriminatory animus or bad faith to them.[8] The defendants' decision was not arbitrary or unreasonable and it promoted the general welfare of the community. *McMahon v. City of Dubuque, supra* at 160. In light of all the circumstances of this case, there was no abridgment of Burns' constitutional rights. The District Court properly granted defendants' motion for judgment notwithstanding the verdict. *See Hanson v. Ford Motor Co.,* 278 F.2d 586 (8th Cir. 1960).

Burns contends that the District Court erred in refusing to admit in evidence certain material relating to settlement negotiations between the parties. It is alleged that the failure to admit this evidence deprived Burns of the opportunity to develop his case against the defendants who were exonerated by the jury verdict.

7. The evidence adduced by defendants at trial indicates that Burns' nonconforming use theory may be untenable. While we need not determine whether Burns' property actually constituted a nonconforming use, we recognize that adopting Burns' theory would lead to some rather inexpedient results. Nonconforming uses are generally classified into four categories: "1. nonconforming buildings, 2. conforming uses of nonconforming buildings, 3. nonconforming uses of conforming buildings, and 4. nonconforming uses of land." D. Hagman, *Urban Planning and Land Development Control Law* 147 (1971). Most ordinances provide for the continuation of nonconforming uses which have effectively antedated the ordinances. Some ordinances provide that the nonconforming use may be converted to a less intensive use. Since nonconforming uses detract from the overall zoning scheme, they are not favored in the law. "Platted but undeveloped land is not normally regarded as a 'use' in zoning law for purposes of establishing a prior nonconforming use." *Parks v. Board of County Commissioners,* 11 Or.App. 177, 196, 501 P.2d 85, 95 (1972). Provisions in an ordinance which permit nonconforming uses are to be strictly construed. *Frost v. Lucey,* 231 A.2d 441 (Me. 1967). The record in the present case does not indicate that Burns' use of his land is contrary to the general residential use in the area. Apparently, no Missouri court has ever ruled that

a residential lot with an inadequate frontage constitutes a nonconforming use in a residential zone. However, according to Burns' theory, any property in the middle of a residential district which did not satisfy the frontage, side-yard or setback requirements could not only be changed to a more intense residential use pursuant to the Des Peres ordinances, but could be used for a restaurant, filling station or any other use permitted in a "C–1" district. Upon full consideration the Board of Aldermen might conclude that Burns' interpretation conflicts with the general principle that zoning ordinances are intended to diminish or decrease nonconforming uses. *Hoffman v. Kinealy,* 389 S.W.2d 745, 750 (Mo.1965).

8. The parties differ as to the standards of aldermanic immunity to be invoked in this case. Burns argues that the liberal immunity test of *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214, 225–26 (1975), should be applied to defendants. Defendants urge that a stricter standard is applicable. *Cf. Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497, 502–03 (1944). We need not determine what standards govern in this case since it is clear that defendants would not be liable even under the more relaxed principles of *Wood v. Strickland, supra.*

In his state court case, which is presently pending, Burns has assailed Des Peres Ordinance # 206 as being invalid as applied to his property. On January 17, 1973, Burns submitted a revised plat to the Des Peres Board of Aldermen with the hope that the plat would be acceptable as a settlement of the state court suit. To encourage settlement of the suit, the circuit court of St. Louis County issued the following order on March 30, 1973:

> [The] Court upon its own motion and by agreement of the parties orders the defendant City to review the entire matter with a view toward possible settlement of the cause, hereby giving said defendant City 30 days within which to consider settlement disposition of said cause * *.

Burns' revised plat was ultimately referred to the Planning and Zoning Commission, which approved it. On May 29, 1973, the Board of Aldermen rejected the revised plat and authorized the City Attorney to defend the City in the state court proceedings.

In the present case the District Court ruled that all evidence relating to settlement negotiations by the parties between January 17, 1973, and May 29, 1973, would not be admitted in evidence. Burns argues that this ruling was erroneous because the negotiations between the parties were settlement negotiations, not compromise negotiations. Burns contends that although offers to compromise are generally inadmissible, offers of settlement are fully admissible. Burns' attempt to draw a fine

semantical distinction between "compromise" and "settlement" serves no purpose. In a practical sense the technical distinction between offers to compromise and offers of settlement is largely illusory. However, although the record clearly supports the conclusion that the parties were actually engaged in compromise negotiations, it is not necessary to draw the distinction between compromise and settlement negotiations. We have recognized that evidence relating to both types of negotiation is inadmissible. *Agrashell, Inc. v. Hammons Products Co.,* 479 F.2d 269, 288 (8th Cir.), *cert. denied,* 414 U.S. 1022, 1032, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973); *Greyhound Lines, Inc. v. Miller,* 402 F.2d 134, 139 (8th Cir. 1968).[9]

We have reviewed Burns' other assignments of error, including those relating to the District Court's dismissal of certain defendants, and find them to be without merit.

The judgment of the District Court is affirmed.

---

**9.** The Federal Rules of Evidence, which were not in effect at the time of Burns' trial, would not mandate a different result. Fed.R.Ev. 408 sets forth the general rule proscribing the admission of compromises or offers to compromise except under limited circumstances. The fact that offers of settlement are not explicitly mentioned does not necessarily sanction their admissibility. The Senate report used the word "settlement" rather than "compromise" when discussing Rule 408. S.Rep.No.93–1277, 93d Cong., 2d Sess. 10 (1974), U.S.Code Cong. & Admin.News 1974, p. 7051. It is clear that evidence relating to settlement negotiations is treated the same as compromise negotiations under Fed.R.Ev. 408. *See Iberian Tankers Co. v. Gates Construction Co.,* 388 F.Supp. 1190, 1192 (S.D.N.Y.1975); Fed.R.Ev. 408, Notes of Advisory Committee.