In accordance with the Court's Memorandum Opinion filed this date,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that judgment be and is entered in favor of plaintiff Gerry H. Dailey and against defendant Public School Retirement System of Missouri.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that plaintiff recover of defendant the right to purchase retirement credit from defendant for the time period from December 1, 1980 through November 30, 1985.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that defendant calculate plaintiff's retirement credit in accordance with the schedule of salary and benefits in effect at the Ferguson–Florissant School District during the time period from December 1, 1980 through November 30, 1985, as though plaintiff had been continuously employed with the district during that time period.

**U.S. PARTNERS FINANCIAL CORPORATION, Kansas City Partners, Ltd., and Entertainment Kansas City, Inc., Plaintiffs,**

v.

**KANSAS CITY, MISSOURI, et al., Defendants,**

**Marion Laboratories, Inc., Mildred Bennett, Mr. & Mrs. Clean, Inc., Intervenors.**

No. 88–1133–CV–W–5.

United States District Court, W.D. Missouri, W.D.

Jan. 19, 1989.

James C. Bowers, Jr., Douglas S. Laird, Polsinelli, White, Vardeman & Shalton, Kansas City, Mo., for plaintiffs.

Dan G. Jackson, III, Asst. City Atty., Kansas City, Mo., for defendants.

Donald W. Giffin, Mark P. Johnson, Therese M. Schuele, Spencer, Fane, Britt & Browne, Sherwin L. Epstein, Kansas City, Mo., for intervenors.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

### I. Findings of Fact

Plaintiffs U.S. Partners Financial Corporation, Kansas City Partners, Ltd., and Entertainment Kansas City, Inc., have filed a complaint seeking injunctive and monetary relief based upon the allegation that § 39.156 Kansas City Code of General Ordinances (COGO) (the adult entertainment zoning ordinance) as applied by the defendants unlawfully deprived the plaintiffs of their Constitutional rights. The First Count of the plaintiffs' complaint states that § 39.156 COGO as applied to the plaintiffs imposes a prior restraint on their First Amendment Right to freedom of expression. The Second Count contends that the plaintiffs were deprived of their Due Process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

Plaintiff U.S. Partners Financial Corporation, a Delaware corporation, is the general partner in plaintiff Kansas City Partners, Ltd., a Texas limited partnership. The third plaintiff is Entertainment Kansas City, Inc., a Texas corporation. The limited partnership is an investment vehicle to acquire capital for the purchase of the site and to refurbish the old Confetti's building. Entertainment Kansas City, Inc. would then lease the property from the limited partnership, and operate and manage the new facility.

The plaintiffs have brought this cause of action against the Defendant City of Kansas City, Missouri, which is a constitutionally chartered municipal corporation under the Constitution of the State of Missouri. Defendant Richard L. Berkley is the Mayor

of Kansas City, Missouri. Defendants Chuck Weber, Sally Johnson, Frank Palermo, Robert M. Hernandez, Joanne M. Collins, Charles A. Hazley, Dan Cofran, Katheryn Shields, Emanuel Cleaver II, Mark Bryant, Bob Lewellen and John A. Sharp are all duly elected members of the City Council of Kansas City, Missouri. Intervenors Marion Laboratories, Inc., Mildred Bennett, and Mr. and Mrs. Clean, Inc. were granted permission to intervene by the Court under Rule 24(a)(2) of the Federal Rules of Civil Procedure. Each Intervenor owns property in the area near the property on which plaintiffs propose to operate an adult entertainment facility.

Before the hearing on the Preliminary Injunction, the Court ordered consolidation of the hearing with the trial on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. This case was heard on January 4–5, 1989. The evidence presented during the two-day trial showed that in the spring of 1988, John Kirkendoll and Mark Mayad, the President and Executive Vice–President of U.S. Partners, investigated the possibility of opening an adult entertainment club [1] in Kansas City. Their interest was sparked by inquiries made by the owner of the Confetti's Club at 4207 Woodfield about selling the existing Confetti's facility to U.S. Partners. Kirkendoll and Mayad inspected the building and adjacent property, and also looked at several other possible sites in the Kansas City area. The plaintiffs determined to purchase the Confetti's property, knowing that it was zoned "CP–2", or planned business center.[2]

As the first step in establishing the Kansas City Gold Club, the plaintiffs filed an application to rezone the site at 4207 Woodfield from District CP–2 to District C–X/C–2. This step was necessary because § 39.156 COGO provides that an exotic dance facility [3] must have C–X zoning. C–X zoning is an "overlay" zoning category which exists in connection with some other category of zoning. Under the City's zoning ordinance, C–X zoning may only be established in C–2 (local retail business dis-

---

1. The plaintiffs testified that it was their intention to open and operate a night club with a "Las Vegas" style show or adult cabaret known as the "Gold Club." The proposed night club would include valet parking and adequate security precautions. The proposal is intended to appeal to a "white-collar" clientele.

2. The Kansas City Zoning Ordinance sets forth requirements for planned CP districts.

   I. Purpose

   District CP is a commercial planned district. It is designed to provide a unified and organized arrangement of buildings and service facilities which have a functional relationship to the properties comprising the development. District CP is further divided into CP–1 (neighborhood), CP–2 (local), and CP–3 (regional) as more specifically described in the following sections.

   Kansas City, Missouri General Ordinance § 39.110 (1987).

   Section 39.110 further sets forth specific requirements for a planned business center.

   (1) The area is subject to location requirements involving size and frontage.

   (2) There are specific requirements for the application and preliminary plan. The requirements for the plan must be followed: Property lines must be shown, and the size, location and arrangement of buildings and parking must be set forth. The plan, which consists of a detailed drawing, must be presented to and approved by an ordinance passed by the City Council.

   (3) The uses permitted in a planned business center are limited to those enumerated in Section 39.111.

   (4) The center must adhere to the height, area and yard regulations found in Section 39.112.

   (5) If the applicant later proposes changes which are not in substantial compliance with the approved site plans, the applicant must essentially go through the entire process again to amend the plan.

   (6) A landscaping plan is required.

   (7) The applicant must prepare a plat as required by the Code and present it to the Council for approval prior to obtaining a building permit.

3. The ordinance defines "exotic dance facility" as "any building, structure or facility which contains, or is used for commercial entertainment, where the patron directly or indirectly is charged a fee to observe specified anatomical areas, provided that the genitals and pubic area of all persons and the areola and nipple of the breasts of all female persons are opaquely covered."

   "Specified anatomical area" is further defined as "less than completely or opaquely covered: (a) Human genitals, pubic region, (b) Buttocks, (c) Female breast area below to a point immediately above the top of the areola."

trict), C–3 (intermediate business), and C–4 (central business district) zones.

In addition to the limitation on the types of zoning over which C–X may overlay, certain geographical limits are placed on its use. C–X zoning may not be established "within 1,000 feet of any church, school, or area zoned for residential use" nor will "more than two of the uses regulated by this section ... be located within 1,000 feet of each other." [4] The ordinance provides that these limitations may be waived if the applicant files a petition with the City Plan Commission "which indicates approval of the proposed regulated use by 51% of the persons residing or owning property within a radius of 1,000 feet of the location of the proposed use."

In an effort to comply with the procedures set out in § 39.156 COGO, the plaintiffs filed their application with the City Plan Commission, a commission comprised of private citizens with expertise in city planning issues. This application included a petition containing the signatures and approval of more than 51% of the persons residing or owning property within a 1,000-foot radius of the adult entertainment facility.[5]

On September 6, 1988, the City Plan Commission considered the proposal and recommended that it be granted. Mr. Joe Serviss, a member of the City Plan Commission, appeared at trial and testified that the plaintiffs' proposal was "a judgment call" on its merits, a decision on which people could disagree. Commissioner Vic-

toria Noteis testified that she agreed with this assessment. Mr. Serviss further testified that he knew of no motivation by the City Development Staff to deny U.S. Partners of its First Amendment Rights.

At the trial of this case, the plaintiffs claimed that at the City Plan Commission hearing, they offered to make their proposal a "limited district plan," or C–2p zoning under § 39.271 COGO. This issue was not raised in the plaintiffs' pleadings and was not raised before the City's zoning authorities. The transcript of the City Plan Commission proceedings indicates the occurrence of a short discussion among the Commission members of a "p" district, but the plaintiffs' attorney made no written offer of a "p" plan, nor were the necessary application and site plan ever filed, examined, or approved by City authorities. The attorney for the plaintiffs claimed that he was willing to orally amend the application, but even if an oral amendment could be effective, he failed to state on the record any of the necessary conditions for a limited district plan. The City Plan Commission never noticed or held a public hearing on a limited district plan, as required by § 39.271(E) COGO. Further, at the Plan Commission hearing, the Assistant City Attorney and the Chairman of the Commission agreed that the matter before the Commission was for an open C–2 zoning, and nothing more.

Following the City Plan Commission's approval of the plaintiffs' proposal, the three ordinances [6] implementing the City Plan

---

**4.** In addition to exotic dance facilities, C–X zoning is required for the operation of adult bookstores, adult entertainment facilities, adult theatres, bathhouses, massage shops, modeling studios, and artist-body painting studios.

**5.** At the trial, the defendants and Intervenors moved to admit evidence to show that the plaintiffs' waiver petition did not meet the requirements set forth in § 39.156. Specifically, the defendants and Intervenors intended to prove:

  a. Plaintiffs included four signatures on their petition of persons who were neither "owners" nor "residents" of property within 1,000 feet of the location of the proposed use.
  b. Several individuals signed the petition two or more times.

  c. Many of the signatures were obtained by false, misleading, and incomplete statements made by plaintiffs' representatives.
  d. Several of the signers had taken timely and effective action to withdraw their support from the petition prior to the City Council's vote.
  e. The signatures were not verified, as required by the ordinance.
  The Court ruled that this evidence was inadmissible because the City Council accepted the facial validity of the petition when they acted on the proposed rezoning.

**6.** a. Proposed Ordinance No. 63093 would have removed a 5.8 acre tract located at 4207 Woodfield Drive, Kansas City, Missouri from an existing Planned Business Center with a zoning classification of CP–2.

Commission's recommendation were introduced before the City Council and the issue was then referred to the Plans and Zoning Committee of the City Council ("P & Z Committee") for a public hearing. On October 12, 1988, after the hearing, the P & Z Committee voted to deny proposed Ordinance No. 63093. Because Proposed Ordinances 63094 and 63095 were contingent upon the passing of No. 63093, there was no need to take action on them after No. 63093 was denied. On October 20, 1988, the City Council adopted the recommendation of the P & Z Committee. The Council voted to deny No. 63093, thereby making Nos. 63094 and 63095 moot.

The plaintiffs contend that the actions of the City Council in denying Ordinance No. 63093 and taking no action on Nos. 63094 and 63095 were done with the intent to impose a prior restraint on the plaintiffs' First Amendment right to freedom of expression. A review of the evidence presented to the City Council in opposition to the proposed ordinances shows that substantial reasons exist for the Council's action which are completely unrelated to the plaintiffs' exercise of their First Amendment rights.

First, on September 8, 1988, the City Development Staff delivered its Combined Staff Report on the three applications in sequence. The Staff Report recommended denial of all three applications. The first application involved severing the CP-2 or planned business district. The Staff concluded that it was not appropriate to remove over one-half of a CP district with an approved site development plan and place it into an "open" zoning district. The Staff Report stated:

> An open C-2 district means that a site development plan is not required or reviewed by the City prior to the use of the property. Even though the applicant is proposing a site development plan for their District C-2/C-X, it is not required and can not be enforced by the City. Additionally, there is a larger planning issue which this case brings forth. That

is whether or not the City should continue to encourage planned development in this area or allow it to be developed with numerous unrelated and uncontrolled uses.

Combined Staff Report at pp. 2-3.

Second, there was competent and substantial evidence presented by Professor Eric Strauss to the Plans and Zoning Committee of the City Council on October 12, 1988 in opposition to the proposed ordinances. His credentials and report were provided to each of the four Council members comprising the Committee. Professor Strauss has a J.D. degree and a Ph.D. in Urban and Regional Planning and is the Chairman of the Graduate Program in Urban Planning at the University of Kansas.

Dr. Strauss opined that rezoning the tract from CP-2 to C-2 would constitute "bad land use planning." As stated in his written report:

> It is my opinion that rezoning the tract from CP-2 to C-2 violates accepted principles of land use planning because:
>
> 1. It is incompatible with prior zoning history.
> 2. It is inconsistent with the adopted South Development Area Plan.
> 3. It violates the purpose of CP-2 zoning in that it threatens the functional relationship of interrelated land uses.
> 4. It is contrary to the implications of the Staff Report.
> 5. It creates too small a district to be effective.
> 6. It creates an area inappropriate for general commercial zoning, creating an incompatible spot of inconsistent zoning.

Strauss Report at p. 1.

Third, there was competent and substantial evidence presented at the October 12, 1988 Plans and Zoning Committee hearing by Albert Margolin. His credentials and report were also provided to each of the members of the Committee. Mr. Margolin

---

b. Proposed Ordinance No. 63094 would have rezoned the property to an open commercial classification of C-2.

c. Proposed Ordinance No. 63095 would have created an overlay zoning classification of C-2/C-X for the site at 4207 Woodfield Drive.

has a J.D. Degree and has had thirty-three years of experience as a real estate appraiser, licensed real estate broker, and senior member of the American Society of Appraisers. He stated that it was his expert opinion that the proposed ordinance, if passed, would have a detrimental effect on adjoining properties, that the zoning proposal was against the comprehensive plan, and the use would create a traffic problem. He stated that CP-2 zoning allows control by the City that the C-2 zoning does not, and he explained other differences between the CP-2 and C-2 zoning classifications.

Mr. Mark Hill, City Planner III, testified before the Committee and stated at the end of his presentation that the City Staff had recommended that each of the requests be denied, especially the first request, which removed the property from the planned business center.

Mr. Jose Aponte, City Planner from the City Development Department Staff, also testified before the Committee. Mr. Aponte concluded his testimony by stating that it would not be in the best interest of the City to rezone the property from CP-2 to an open zoning.

At this meeting, the expert testimony of Dr. Eric Strauss and Albert Margolin, as well as Planners Hill and Aponte, was unrefuted by any expert witness for plaintiffs. The plaintiffs failed to present any evidence to refute the evidence presented against the proposal. Mr. Jim Bowers, attorney for the plaintiffs, merely introduced himself and his clients' proposal. This did not constitute expert, competent, or substantial testimony.

In addition to the evidence that was before the City Council, the defendants and Intervenors called Professor Robert H. Freilich to testify before the Court as to the secondary impacts that the proposed rezoning would have on the area. Professor Freilich's creditionals are unsurpassed in the areas of Urban Planning and Land Use Control and will not be reiterated here. Professor Freilich testified that the flexible "planned district zoning" such as implemented by Kansas City in the CP-2 zoning of 4207 Woodfield is the trend used across

the United States since 1956. He further stated that "floating zones" such as the C-X overlay zone are widely used for "difficult uses" such as cemeteries, airports, waste site disposal and adult uses. This is the preferred method of legislating these uses because the City Council can review the proposal in light of all the criteria in the Ordinance and the secondary impacts that such a use would have on the surrounding area.

Professor Freilich testified that § 39.156 COGO was closely modeled after the Detroit zoning ordinance which was approved by the United States Supreme Court in *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). This ordinance follows the dispersal method of dealing with difficult uses. Freilich found that the procedures followed by the City Council in reviewing the rezoning proposal were in accord with national standards and met the United States Supreme Court requirements set forth in *Young,* 427 U.S. 50, 96 S.Ct. 2440 (1976), and *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

After careful review of the evidence presented, it is the conclusion of the Court that the credible evidence proves that rezoning 4207 Woodfield from CP-2 to C-2 to allow for an adult entertainment facility or exotic dance facility would have adverse secondary effects on surrounding properties, including reduced property values, increased traffic flow and crime, and greater danger to neighborhood health, safety and welfare. Therefore, the defendants' decision to deny the plaintiffs' rezoning application was properly based on secondary impact considerations, rather than an attempt to deny the plaintiffs' First Amendment rights.

## II. Conclusions of Law

### A. *First Amendment Claims*

■ The plaintiffs have brought this cause of action against the defendants under 42 U.S.C. §§ 1981 and 1983, alleging that the plaintiffs' First, Fifth, and Fourteenth Amendment Rights have been vio-

lated. Count I of the plaintiffs' complaint alleges that § 39.156 COGO constitutes a prior restraint on the plaintiffs' First Amendment right to freedom of expression.

The United States Supreme Court has held that live entertainment, including nude dancing, is protected under the First Amendment. *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Young,* 427 U.S. at 61–62, 96 S.Ct. at 2447–48. It is well-established that an entertainment program may not be prohibited solely because it displays the nude human figure. Nudity alone does not place otherwise protected material outside the mantle of the First Amendment. *Schad,* 452 U.S. at 66, 101 S.Ct. at 2181; *Jenkins v. Georgia,* 418 U.S. 153, 161, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974).

Having established that nude dancing is a constitutionally-protected First Amendment activity, the inquiry turns to whether § 39.156 COGO constitutes a valid time, place, or manner restriction. Reasonable regulations of the time, place, and manner of protected speech, where those regulations are necessary to further significant governmental interests, are permitted by the First Amendment. *Young,* 427 U.S. at 63, 96 S.Ct. at 2449 n. 18.[7]

Zoning ordinances constitute one way in which a city may reasonably regulate time, place and manner of protected speech. In their capacity as zoning authorities of the City of Kansas City, the City Council and its designated subordinates have the right to regulate the development of property in Kansas City. This power includes the right to require that certain property uses be limited to certain areas of the City which the City Council considers most appropriate for such uses. Appropriate municipal zoning controls have been sanctioned by the courts for many years. *See,*

*e.g., Euclid v. Ambler Realty Co.,* 272 U.S. 365, 386–87, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926).

Thus, it is clear that the City of Kansas City has the right to engage in zoning of property uses which are otherwise constitutionally protected. The City has the right and power to regulate the time, place and manner of the plaintiffs' offering of adult entertainment in Kansas City. The City does not have the right, however, to enact regulations to restrain speech on the basis of its content. *City of Renton,* 475 U.S. at 47, 106 S.Ct. at 928. By contrast, "content-neutral" regulations are accepted as long as they "are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Id.*

The plaintiffs argue that the defendants refused to rezone the site at 4207 Woodfield from CP–2 to C–2/C–X solely to deny the plaintiffs their First Amendment rights. The defendants counter this argument by citing numerous "content-neutral" reasons for their denial of Proposed Ordinance No. 63093. The Court finds that the evidence presented, as reflected in the Findings of Fact, indicates that the City's pursuit of its zoning interests were unrelated to the suppression of free expression. The CP–2 planned district is designed to protect the City's retail trade, maintain property values, and to protect and preserve the quality of life of the residents in the South Area Development Plan district, not to suppress the expression of protected speech activity.

It would be naive for the Court to assume that the secondary effects of the adult entertainment facility were never considered by the City Council members in deciding to deny Proposed Ordinance No. 63093. The law is clear, however, that legislators may consider the secondary effects of such facilities on the community. *Id.* 106 S.Ct. at 929. In the case of *Thames*

---

**7.** The plaintiffs suggest that this case should be analyzed under the four-part test articulated by the Supreme Court in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed. 2d 672 (1968). The *O'Brien* opinion is not binding authority because in *City of Renton,* 475 U.S.

at 47, 106 S.Ct. at 928, the Supreme Court swayed from its earlier reliance on the *O'Brien* four-prong test to judge regulations that affect First Amendment activity. In place of this test, the Court adopted a time, place and manner analysis. *Id.*

*Enterprises, Inc. v. City of St. Louis,* 851 F.2d 199 (8th Cir.1988), the Eighth Circuit recently held that a St. Louis zoning ordinance regulating the location of adult uses was constitutional. At a meeting of the St. Louis Board of Aldermen, the President of the Board testified that in his opinion, adult businesses tend to attract transients and were not conducive to a "stable, growing, vibrant neighborhood." *Id.* at 200. The Eighth Circuit affirmed the district court's ruling "that the ordinance was not directed at the content of the products sold at affected establishments, but rather at the 'secondary effects' of such businesses on the surrounding communities." *Id.* at 201. The expert testimony presented at the public hearing, as well as the testimony of Professor Freilich at the hearing before the Court, substantiate the fact that the City Council was justified in considering the secondary effects of the proposed adult entertainment facility on the surrounding community.

Consistent with the right to regulate time, place, and manner of free speech expression is the right to disperse or concentrate adult entertainment uses. The City Council of Kansas City has chosen to adopt a "dispersal" scheme of regulation of location of adult entertainment uses, a zoning scheme expressly approved in *Young v. American Mini Theatres, Inc.,* 427 U.S. at 71–72, 96 S.Ct. at 2453. The Court sanctioned the locational zoning regulation of adult uses with the following language:

> [w]e have no doubt that the municipality can control the location of theatres as well as the location of other commercial establishments, either by confining them to a certain specialized commercial zone or requiring that they be dispersed throughout the city. The mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not sufficient reason for invalidating these ordinances.

*Id.* at 62, 96 S.Ct. at 2448. This opinion makes it clear that the Kansas City dispersal method used for zoning C–X uses is constitutional. It clearly leaves open alternative channels of communication, as required by *City v. Renton,* 475 U.S. at 47, 106 S.Ct. at 928.

The plaintiffs rely heavily on the case of *Walker v. City of Kansas City, Missouri,* 691 F.Supp. 1243 (W.D.Mo.1988), to support their proposition that § 39.156 COGO is unconstitutional. The Court finds that this reliance is misplaced. The facts of *Walker* are clearly distinguishable from the case at bar.

Plaintiff Walker had owned and operated a lounge for fifteen years when he decided to change the operation from a cocktail lounge to an exotic dance facility. The lounge was located in an area which was already zoned C–2 (local retail business). Under the Kansas City zoning scheme, he needed only to obtain a C–X "overlay" before instituting this change. *Id.* at 1244–45.

The City Development Office studied Walker's proposal and issued a staff report. The staff report, issued May 1, 1986, recommended that the City Council approve the rezoning. The matter was then sent to the City Council in the form of a proposed ordinance, but no vote was taken on the ordinance until December 17, 1987. The City Council voted against Walker's proposal, thereby prompting his challenge of the ordinance on the grounds of prior restraint and due process. *Id.* at 1245–46.

Judge Stevens held that Walker had suffered no due process deprivation, either substantively or procedurally. Walker had not overcome the presumptive regularity which courts must afford legislative acts, so he could show no denial of substantive due process. *Id.* at 1246–47. Furthermore, Walker had no cognizable property right, thereby obviating his procedural due process claim. *Id.* at 1248. However, Judge Stevens found that § 39.156 COGO, as applied to Walker, was an impermissible prior restraint on protected First Amendment expression because the ordinance contains no "narrow, precise, and objective standards" to guide the City Council's con-

sideration. *Id.* at 1250.[8]

In the case before this Court, the plaintiffs' factual position is far different from Walker's. Here, the subject property is in a CP–2 zone (planned business center), not C–2, as was Walker's. The City Development Staff recommended approval of the application in *Walker.* In contrast, the staff report in this case recommends denial of the applications. In sum, the plaintiffs have chosen to locate their proposed facility in an area where a comprehensive land use plan has been in effect for nearly twenty years, thereby subjecting themselves to different zoning considerations than those involved in *Walker.* Therefore, the *Walker* case is not persuasive precedent in the case at bar.

It is the conclusion of this Court that the City Council's refusal to rezone the site at 4207 Woodfield was a content-neutral decision. The City Council has opened other available avenues for communication, making some areas available for exotic dance facilities, while at the same time preserving the quality of life in other areas of the community. This is the essence of zoning. This Court will not assume the role of a "super zoning board" and reverse the Council simply because a contrary result would have been permissible. *Burns v. City of Des Peres,* 534 F.2d 103, 108 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976) (citations omitted).

### B. *Due Process Claim*

The plaintiffs' complaint alleges in Count II that the defendants have deprived them of their Due Process Rights in failing to act on Proposed Ordinances No. 63094 and 63095. In order for the plaintiffs to prevail on this theory, they must first show that they have a cognizable liberty or property right. The plaintiffs' real estate contract, which will be finalized only if the site is rezoned, confers nothing more than a unilateral expectation of property interest. Absent a legitimate claim of entitlement, the plaintiffs have no due process claim. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed. 2d 548 (1977).

In addition to the lack of a claim of entitlement, the plaintiffs' due process claim must fail because, as previously explained, passage of all three ordinances was necessary to implement the zoning for an exotic dance facility. On October 20, 1988, the City Council denied the application for proposed ordinance No. 63093 which would have removed 5.8 acres located at 4207 Woodfield from an existing Planned Business Center with a zoning classification of CP–2. Denial of Proposed Ordinance No. 63093 made further consideration of Proposed Ordinances Nos. 63094 and 63095 moot. In light of the Court's ruling on the validity of the denial of Proposed Ordinance No. 63093, there is no need to consider the alleged Due Process

---

**8.** The *Walker* opinion's reference to "narrow, precise, and objective standards" is based on the licensing case of *Shuttlesworth v. City of Birmingham, Alabama,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). *Shuttlesworth* involved the necessity of having a license before participating in a parade, procession, or other public demonstration. It is, therefore, not compelling precedent in a zoning case such as that which is presently before the court.

Justice Powell, in a concurring opinion, distinguished licensing and zoning in *Young* by stating:

[T]his situation is not analogous to cases involving expression in public forums or to those involving individual expression or, indeed, to any other prior case. The unique situation presented by this ordinance calls, and cases in this area often do, for a careful inquiry into the competing concerns of the State and the interests protected by the guarantee of free expression.

*Young,* 427 U.S. at 76, 96 S.Ct. at 2455 (Powell, J., concurring).

Justice Powell further distinguished cases involving this kind of zoning ordinance from licensing cases on the basis of whose First Amendment right is to be protected:

In many instances, for example, with respect to ... licensing schemes, it is only the theater owner or the bookseller who can protect this interest. But the central First Amendment concern remains the need to maintain free access of the public to the expression.

*Id.*

In light of the fact that the *Walker* opinion is based on a licensing analysis and the case at bar is a zoning case, this Court agrees with the defendants and Intervenors that it has no application to the case at bar.

violations concerning the remaining proposed ordinances.

## C. *Additional Claims*

In addition to the two counts pled in the plaintiffs' complaint, the plaintiffs raised two other matters in a brief filed the day before the trial. The plaintiffs shall be permitted to amend their pleadings to conform to the evidence under Rule 15(b) of the Federal Rules of Civil Procedure. This ruling will not prejudice the defendants and the Intervenors, however, because these claims are without merit and shall be disposed of by the Court as follows:

■ Plaintiffs consistently argued that their claims in this case did not involve a challenge to the facial validity of the C–X ordinance, § 39.156 COGO. Rather, they alleged the ordinance was unconstitutional *as applied* to these plaintiffs. On the day before the trial, plaintiffs raised a facial validity challenge to § 39.156 on the ground that restricting adult entertainment facilities to specified zoning categories violates equal protection.

The Court finds this argument unavailing. The Supreme Court has expressly rejected equal protection challenges to ordinances virtually identical to the Kansas City ordinance in both *Young,* 427 U.S. at 63–73, 96 S.Ct. at 2448–53, and in *City of Renton,* 475 U.S. at 55, 106 S.Ct. at 933 n. 4. As Justice Stevens explained in *Young,* "the State may legitimately use the content of [adult entertainment facilities] as the basis for placing them in a different classification from other [facilities]." *Young,* 427 U.S. at 70–71, 96 S.Ct. at 2452. Furthermore, the ordinance is justified because "the city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect." *Id.* at 71, 96 S.Ct. at 2452.

The Court determines that a rational basis exists for the City's C–X zoning restriction. Under the controlling Supreme Court precedents cited above, plaintiffs have no plausible equal protection challenge. Section 39.156 suffers from no facial constitutional challenge.

In addition to the equal protection claim, plaintiffs also raised a new theory of relief on the day before the trial. Plaintiffs' counsel admitted that this theory was developed well after the complaint was filed, and only within four working days before trial. Plaintiffs claim that, if their application for dismantling the CP–2 Planned Business Center was rejected for land use reasons, then they should be able to propose a "p" or "limited district" and satisfy the City's land use concerns. This "limited district" is described in the Zoning Ordinances as a C–2p zone. *See* § 39.271 COGO. Defendants and Intervenors objected to the introduction of evidence concerning a C–2p zone on a number of grounds, but their principal objection was that plaintiffs had not presented a C–2p zoning application to the City, as required by § 39.271 COGO. Therefore, they argued, the City Council did not act on any such proposal and this Court may not properly review matters that were never brought before the Council.

The Court received evidence on this issue, and now concludes that Intervenors' argument accurately states the factual record in this case. During his presentation to the City Plan Commission, plaintiffs' attorney mentioned his clients' willingness to avert open zoning by creating a limited district. However, plaintiffs proceeded under their written applications, and those applications contained no mention of a C–2p proposal. Any discussion before the City Plan Commission of a limited district, or C–2p zoning, was purely academic. As an Assistant City Attorney pointed out to the members of the Commission, they had no limited district application before them. They only had an application which called for open zoning.

There is no evidence that plaintiffs ever raised the issue of a limited district, or C–2p zone, during the Plans & Zoning Committee hearing. Likewise, there is no evidence that plaintiffs raised this issue before the City Council, and they conceded as much at trial. Plaintiffs had numerous avenues open to them for a C–2p proposal. They could have amended their application, either orally or in writing. The City Plan

Commission could have recommended the C–2p designation on plaintiffs' behalf. *See* Section 39.370 COGO. Plaintiffs could have asked a member of the City Council to introduce an ordinance to that effect. However, they availed themselves of none of these opportunities. As a consequence, the City Council did not have a C–2p proposal to consider.

Having reviewed the evidence, the Court concludes that the plaintiffs have never formally proposed a C–2p zoning for the property. Therefore, the Court shall not review matters that were not properly before the Council.

Accordingly, it is hereby

ORDERED that the plaintiffs' Motion for Declaratory and Injunctive Relief is denied.