[No. G010204. Fourth Dist., Div. Three. Dec. 16, 1991.]

MIKE ROSS et al., Plaintiffs and Respondents, v.
CITY OF YORBA LINDA et al., Defendants and Appellants.

**COUNSEL**

Rutan & Tucker, Leonard A. Hampel and Darwin Kinghorn for Defendants and Appellants.

James A. Stearman for Plaintiffs and Respondents.

**OPINION**

**SILLS, P. J.—**

## I

### INTRODUCTION

The Ross family owns a 1.117-acre lot in Yorba Linda which is virtually surrounded by parcels of lesser size. At present, the property is zoned to allow only one dwelling per acre. If, however, the lot were rezoned to the zoning category to which most of the surrounding lots conform, the Rosses

could build another house on the property. The Rosses got initial approval for rezoning from the planning commission, but the city council turned them down after neighbors voiced opposition. The Rosses then filed this lawsuit, based on, among other things, discriminatory "spot zoning."

The Rosses prevailed with the trial court, and the city has now appealed. We affirm, following *Hamer* v. *Town of Ross* (1963) 59 Cal.2d 776 [31 Cal.Rptr. 335, 382 P.2d 375], which cannot be meaningfully distinguished from the instant case.

## II

### FACTS

The Rosses' lot is located in the northwest corner of a block of land bounded by Oriente Drive on the north, Ohio Street on the west, Yorba Linda Boulevard on the south, and Palm Avenue on the east. The northern half of the block consists of 53 lots, the average size of which is 22,530 square feet—a little more than half an acre. Only four of the lots on the block, including the Rosses', equal or exceed an acre. Each of these four lots fronts Oriente Drive. Two lie immediately to the east of the Rosses' lot. The fourth is separated from the other three by a fifth lot, not quite an acre, which also fronts Oriente Drive. Seven of the forty-eight smaller lots lie to the east of the five larger lots, while the remainder lie to the immediate south and southeast.

To the immediate north of the block lies an area of 32 lots, 29 of which consist of less than an acre. More than half of the 32 are less than half an acre. Despite the relatively small lot sizes predominating in this area, it is zoned "residential agricultural," a classification which requires at least one acre of land to build a dwelling.

The area to the northwest, west, and southwest of the block (i.e., the area west of Ohio Street) is a residential area which has been zoned "residential estate," which allows 1.8 dwellings per acre. The southern half of the block and part of the area to the north of the 32 lots are also "estate" zoned.

The northern half of the block is zoned "residential low density." This zoning category requires an owner to have at least one acre to build a dwelling. Thus only 4 lots of the 53 (less than 10 percent) in this northern half "conform" to this "low density" zoning. Of these four, three, including the Rosses', are large enough to have another dwelling built on them if they were zoned "estate."

A 30- to 40-year-old house sits on the southern part of the Rosses' lot, leaving the northern part (closest to the intersection) vacant. The Rosses want to divide their lot into northern and southern sectors and build a new home on the northern sector. In February 1989 the Rosses applied to the city to divide their property into a northern and southern half, and have the zoning covering the property changed from "low density" to "estate." After the division, each lot would still be larger than half an acre.

At the time (and despite the city's one-house-per-acre zoning) the city's general plan allowed 1.8 dwellings per acre on the block. The city planning commission recommended approval of the zoning change and subdivision. The commission noted the requests were consistent with the city's general plan and entailed no significant effects on the environment. Nevertheless, in April 1989, after a group of neighbors voiced their opposition to the Rosses' proposal, the city council denied the request.

In November 1989, the Rosses filed a petition for a writ of mandate and a complaint for declaratory relief against the city, charging the low density zoning was unconstitutional as applied to them. After the Rosses filed the lawsuit, the city amended its general plan to reduce the allowable density for just the five large lots fronting Oriente Drive to one dwelling per acre from the previously allowable 1.8 per acre. A memorandum to the city council dated February 13, 1990, explicitly reveals the amendment was a direct consequence of the city's denial of the Rosses' rezoning request. The density of the rest of the block remained unchanged in the city's general plan at 1.8 dwellings per acre.

The lawsuit came to trial in summer 1990. The court held that the one-acre restriction on the Rosses' lot was arbitrary and discriminatory, and therefore unconstitutional. The court found the character of the area to be suburban, not rural. It granted a writ of mandate commanding the city to allow the Rosses to process their application without imposing a density or lot size stricter than that required by estate zoning, and without regard to the recent amendment to the general plan.

III

DISCUSSION

A

1

While every intendment favors the constitutionality of local land use restrictions (see *Wilkins* v. *City of San Bernardino* (1946) 29 Cal.2d 332,

338-339 [175 P.2d 542]; *G & D Holland Construction Co.* v. *City of Marysville* (1970) 12 Cal.App.3d 989, 994) [91 Cal.Rptr. 227], they cannot be arbitrary and discriminatory. (See, e.g., *Hamer* v. *Town of Ross, supra,* 59 Cal.2d 776, 781-783; *Skalko* v. *City of Sunnyvale* (1939) 14 Cal.2d 213, 215-216 [93 P.2d 93]; *Reynolds* v. *Barrett* (1938) 12 Cal.2d 244, 251 [83 P.2d 29]; *Viso* v. *State of California* (1979) 92 Cal.App.3d 15, 22 [154 Cal.Rptr. 580]; *Morris* v. *City of Los Angeles* (1953) 116 Cal.App.2d 856, 861, 863 [254 P.2d 935].)

██ A blatant example of discriminatory land use legislation is "spot zoning." Spot zoning is "[w]here a small parcel is restricted and given less rights than the surrounding property . . . ." (*Wilkins* v. *City of San Bernardino, supra,* 29 Cal.2d at p. 340.) ██ ██ ██ As the court said in *Reynolds* v. *Barrett, supra,* 12 Cal.2d at page 251, "It is obvious that by a zoning ordinance a city cannot unfairly discriminate against a particular parcel of land."[1]

In *Hamer* v. *Town of Ross, supra,* 59 Cal.2d 776, the Supreme Court considered a spot zoning case similar to the one here. In *Hamer,* the plaintiff owned a 2.2-acre parcel of land on which she wanted to build a multiple-dwelling garden apartment. To the east, north, and west, the property was surrounded by single-family homes on smaller parcels (three of which, however, were one-acre lots), while a hospital and its parking lot and utility service occupied the south and southeast of the property. The parcel was zoned to require a minimum lot size of one acre, as was all the property to the north and northeast, even though the "preponderance" of the lots in the zone were one-quarter to one-half an acre. (See 59 Cal.2d at p. 780.)

In 1957, the plaintiff petitioned the city council for an amendment to the city's zoning ordinances to establish a classification for multiple garden apartments and to include her property in the classification. The council denied the petition. The next year, she applied for a variance from the zoning ordinances to permit construction of garden apartments, and the council again denied her application. She filed suit, and the case eventually reached the state Supreme Court.

While the court upheld the single-family home restriction, it struck down the one-acre minimum lot size zoning as arbitrary and discriminatory. (See

---

[1]Spot zoning is one of four categories of zoning ordinances which California courts have typically held invalid and unreasonable as applied to particular property. (*Wilkins* v. *City of San Bernardino, supra,* 29 Cal.2d at p. 340.) The three other categories are (1) zoning prohibiting existing and established uses that are not nuisances, (2) zoning creating a monopoly, and (3) zoning permitting only uses which are entirely unsuited or unusable in light of the use of adjacent property. (*Ibid.*)

59 Cal.2d at pp. 790-791.) ■ Justice Tobriner, writing for a unanimous court, began the opinion with the flat statement: "[Z]oning ordinances which impose a one-acre lot restriction cannot properly apply to property which is virtually surrounded by parcels of lesser size . . . ." (59 Cal.2d at p. 778.) Words to the same effect were repeated twice in the opinion:

"As to the one-acre limitation, we believe that, due to the location of the property in an area of smaller parcels, as well as to other considerations, the requirement is unreasonable, oppressive and unwarranted." (59 Cal.2d at p. 781.)

"In reality we contemplate here an isolated area that has become an 'island' of one-acre minimum lot size zoning in a residential ocean of substantially less restrictive zoning." (59 Cal.2d at p. 782.)

Here, as in *Hamer*, the subject property is "virtually surrounded by parcels of lesser size." (See 59 Cal.2d at p. 778.) Here, as in *Hamer*, a one-acre restriction prevents a landowner from developing property consistent with the surrounding area. The character of the area is *already* suburban rather than rural; and, as the trial judge noted, the city would only be fooling itself to pretend otherwise. Even after the proposed division of the Rosses' property, the two remaining lots will still be larger than many in the area.

The most one can say to distinguish *Hamer* is that here the Rosses' lot is one-third of an island consisting of about three and one-half acres, while in *Hamer* the subject property was a two-acre island by itself. This is not a meaningful difference.

Nor can it be argued the three lots function as some kind of "buffer zone" between areas of disparate density. In *Hamer* the existence of three nearby one-acre lots which, like the subject property, were surrounded by smaller parcels did not affect the court's analysis (see 59 Cal.2d at p. 782), and there is no reason the result should not be the same here. If five acres distributed throughout a small archipelago of four islands warranted equal treatment with the surrounding ocean in *Hamer*,[2] then so should three and one-half acres aggregated into one island in this case.

2

The city asserts *Hamer* is "easily distinguishable" from the instant case. There is more bravado than substance in the assertion.

---

[2]While the *Hamer* court did not expressly say the other "conforming" lots were also eligible for less restrictive zoning, the tenor of the opinion suggests they would have been similarly eligible had their zoning status also been before the court.

■ First, the city argues there is a rational basis for the zoning in the instant case that was not present in *Hamer*. The only basis advanced, however, is the prevention of "encroaching urbanization." This point fails because the prevention of "urbanization" ("suburbanization" would be more accurate) cannot be a rational basis where "urbanization" has *already* taken place. If a vacant acre is surrounded by high rises it would be absurd to claim that acre should be treated differently from surrounding property to *prevent* "urbanization." Whatever other reasons might justify a different classification (e.g., a need for park space), one could not claim development of the acre would *change* the character of the area.

■ The city's second attempt to distinguish *Hamer* is to put forth the "domino theory" of creeping "zoning concessions." The city argues that if it is forced to allow the Rosses to build on their land consistent with the surrounding lots, other landowners will invariably use the Rosses' case as precedent in seeking their own zoning changes.

This contention, however, only reasonably applies to the two other lots on the block which are large enough to allow for another house if the area were rezoned. The city makes no claim that the construction of new homes on these two particular lots would change the character of the area, and advances no reason why the owners of these lots should not also be treated like their surrounding neighbors. The city's main concern does not appear to be with the rest of the "island" in this case.

Rather, the dark implication in the city's argument is that there are numerous "islands" in the city's zoning scheme, and that the "line must be drawn" at this one, lest others fall prey to "urbanization." Be that as it may, *arbitrary* line-drawing is antithetical to the individual right to equal protection of the law. The city appears to be afraid it will be forced to treat other landowners in a nondiscriminatory manner if it treats the Rosses in a nondiscriminatory manner. This is not an idea with much persuasive force.

The city's third attempt to distinguish *Hamer* is to argue there was no evidence there as to whether the smaller surrounding lots were preexisting nonconforming uses, while here there was. True, the record in *Hamer* did not disclose the reason the surrounding lots were smaller. But it is also quite clear from the text of the case the court was not concerned about the point. The actual language of the opinion shows the result would have been the same in any event:

"Plaintiff's property is situated in residential class F, which fixes the minimum lot-size requirement at one acre. The land to the north of plaintiff's

property on both sides of the boulevard is also zoned residential class F, but, as we have noted, the preponderant number of these lots contain approximately 10,000 to 20,000 square feet. The record does not disclose whether these lots were subdivided and the homes built on the property before the imposition of the minimum lot-size restriction, or despite the zoning ordinances, built after such regulation. Nor does the record disclose whether these homes were permitted as variances. *In any event*, nothing in the record suggests that these improved 10,000 to 20,000 square foot lots do not comprise a relatively permanent part of the [city's] landscape." (59 Cal.2d at p. 780, italics added.)

Here, as in *Hamer*, nothing suggests that the smaller surrounding lots do not also "comprise a relatively permanent part" of the Yorba Linda landscape.

The fourth effort to differentiate *Hamer* concerns the time of purchase of the property. In *Hamer*, the plaintiff had no restrictions on lot size when she purchased her property, whereas in this case the property was already zoned to require a minimum one-acre lot size when the Rosses purchased it. This argument fails because time of purchase has no necessary logical relationship with spot zoning. It makes no sense to suggest it is permissible to spot zone property before a particular buyer purchases it even though it is not permissible after. The city provides us with no authority holding otherwise. Moreover, the time when the plaintiff in *Hamer* purchased her property does not appear to have played any role in the court's analysis. (See 59 Cal.2d at pp. 781-783.)

The final ground of distinction asserted by the city is procedural. The city argues *Hamer* involved a plaintiff seeking a variance, not a change of a zoning ordinance, and that a variance is a judicial act, review of which is subject to higher scrutiny than a legislative act of the type at issue here. This contention fails because there is nothing in *Hamer* to indicate it was employing anything stricter than the classic "rational basis" test. Indeed, *Hamer* explicitly adopted a minimal scrutiny test, stating zoning regulations " 'will not be set aside or disregarded by the courts unless the regulations have no reasonable relation to the public welfare or unless the physical facts show that there has been an unreasonable, oppressive, or unwarranted interference with property rights in the exercise of the police power.' " (59 Cal.2d at p. 782, quoting *Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 461 [202 P.2d 38, 7 A.L.R.2d 990].)

*Hamer* thus cannot be distinguished. The land use restrictions here are as arbitrary and discriminatory as the land use restrictions in *Hamer.*

B

As related, the city council denied the Rosses' application after a group of neighbors voiced opposition. On appeal the city seeks to use this fact to its advantage. It claims discriminatory spot zoning (in the form of a denial of a request for rezoning to conform to the surrounding area) may be justified by the *mere fact* of neighborhood opposition, quite independent of whether that opposition is rational. The city appears to be saying that neighborhood opposition to construction on nearby private property is *itself* a "rational basis" for a local government body to forbid the construction.

This argument, carried to its logical conclusion, would be fundamentally destructive of the basic rights guaranteed by our state and federal Constitutions. If public opinion *by itself* could justify the denial of constitutional rights, then those rights would be meaningless.[3] The most arbitrary treatment of an individual or irrational legislative classification would pass constitutional muster under the "rational basis" test if all that need be shown is support by some segment of the public.

The city cites three cases as legal authority for the idea "that opposition of neighbors to a proposed development is in and of itself a legitimate reason for the City Council to deny such development." These cases are *Nelson* v. *City of Selma* (9th Cir. 1989) 881 F.2d 836, *Mira Development Corp.* v. *City of San Diego* (1988) 205 Cal.App.3d 1201 [252 Cal.Rptr. 825], and *Ensign Bickford Realty Corp.* v. *City Council* (1977) 68 Cal.App.3d 467 [137 Cal.Rptr. 304].

In *Nelson*, a developer sought to rezone 13 acres from low-density residential to high-density residential. A number of residents in the area opposed the application. The city council denied the application and the developer filed a civil rights action. The federal district court ruled the denial of the application was rationally related to maintaining the character and integrity of the surrounding single-family neighborhood, preventing undue concentration of population, lessening traffic congestion and maintaining property values. (881 F.2d at p. 838.)

---

[3]See *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 141 [93 Cal.Rptr. 234, 481 P.2d 242]: "The separation of powers doctrine articulates a basic philosophy of our constitutional system of government; it establishes a system of checks and balances to protect any one branch against the overreaching of any other branch. [Citations.] Of such protections, probably the most fundamental lies in the power of the courts to test legislative and executive acts by the light of constitutional mandate and *in particular to preserve constitutional rights, whether of individual or minority, from obliteration by the majority.*" (Italics added.) (Cf. 1 Tocqueville, Democracy in America (1945) at pp. 258-262 [discussion of need to structure government to protect against "tyranny of the majority"].)

On appeal the developer argued, "[t]he only reason for the denial of the zoning change was the unreasoning opposition of the neighbors." (881 F.2d at p. 838) The Ninth Circuit rejected the contention because there was "ample evidence in the record" to show the denial "rationally related" to the "preservation of the character and integrity" of the neighborhood. (*Id.* at p. 839.)

Having refuted the developer's contention, the court could have stopped. However, it added the following sentence to buttress its conclusion: "The opposition of neighbors to a development project is also a legitimate factor in legislative decisionmaking," and cited *Burns* v. *City of Des Peres* (8th Cir. 1976) 534 F.2d 103, 110. At the end of the decision, the court repeated itself: "The opinion of area residents concerning neighborhood preservation is an appropriate factor for consideration in zoning decisions. Other courts have so held . . . ." The court concluded by citing *Burns* and *Mettee* v. *County Commissioners of Howard County* (1957) 212 Md. 357 [129 A.2d 136].

*Nelson* did not say public opposition *alone* was a sufficient reason to deny a rezoning request. Rather, it stated, twice, that opposition was a "factor" in the decision. To the degree that public opposition to a particular kind of land use *articulates* a rational basis for the subsequent legislative decision, there can be no quarrel. And there can be no quarrel that a legislative body has both the right and duty to listen to its constituents.

The *Nelson* court had a rational basis for the zoning refusal independent of the public opposition to the development. The public opposition to the rezoning application in *Nelson* was not significant for its own sake, but because it expressed the rational concerns of neighbors "that the proposed development would increase traffic and change the character of the single-family neighborhood." (881 F.2d at p. 839.) Without question, a group of residents can voice logical and reasonable concerns against rezoning. On the other hand, their opposition can also be founded on gibberish.

Moreover, the legal authority on which *Nelson* relied does not support any such suggestion: *Burns* v. *City of Des Peres, supra,* 534 F.2d 103 and *Mettee* v. *County Commissioners of Howard County, supra,* 129 A.2d 136. *Burns* involved a developer's request to rezone three adjoining tracts of land from a zoning classification requiring a one-acre minimum lot size to a zoning classification requiring only a third of an acre minimum lot size *despite* the fact that *none* of the lots in the immediate area were as small as a third of an acre. (See 534 F.2d at p. 109.) Given that no subdivision in the immediate vicinity of the property was zoned for density greater than about two-thirds of an acre, the Eighth Circuit had no trouble upholding the denial of the rezoning application.

After establishing a rational basis for the denial, however, the court stated: "Defendants' refusal to rezone Burns' property is further supported by the fact that several persons, including various property owners in the area, voiced objections to the rezoning at a public hearing. Property owners in the area who have relied on the existing zoning classification have an interest in the perpetuation of such scheme unless the public good dictates a change. [Citation.] The defendants were entitled to *consider these objections* in ruling on Burns' request for rezoning. The evidence in this case shows that defendants' decision not to rezone Burns' property was not arbitrary, unreasonable or discriminatory." (534 F.2d at p. 110, italics added.)

Although this passage is not crystal clear, it is more in keeping with its context to read it as focusing on the *merit* of the neighbors' "objections" rather than on the mere fact of the neighbors' opposition. It is only common sense that a city council should "consider" the objections of neighbors to a rezoning request—but for *what those objections are worth*—not the mere fact they are made.

In *Mettee v. County Commissioners of Howard County, supra,* 129 A.2d 136, a county government initially zoned a 16-square-mile area to require ½-acre minimum lot sizes. This zoning, however, was only tentative. Later, a local planning commission took a survey and found a large majority of the owners in the area favored a change to more restrictive one-acre zoning. The modification was implemented by the county government and then challenged by one of the owners.

The zoning change was upheld, as supported by a rational basis, in that it would discourage too rapid subdivision growth, prevent strain on the financial resources of the county, and alter the rural character of the area. (See 129 A.2d at pp. 140-141.) In the process, the court had to confront the overwhelming support of local property owners to the "change." (It actually was not a change, as the court explained, because the initial zoning was only tentative anyway.) The court stated: "Obviously, an exercise of the police power cannot be made to depend upon a count of noses, but, on the other hand, the very fact that a public hearing is required before the adoption or reconsideration of a master plan indicates that public sentiment on the proposal is not wholly irrelevant. The zoning authorities are by no means bound to regard the wishes of property owners, but their decision is not to be condemned *simply* because it adopts the views advocated by a majority of the persons primarily affected." (129 A.2d at p. 140, italics added.)

While this language might be interpreted to mean public opinion may have some independent force in a land use decision, its central focus is

rejection of the idea that public opinion is automatically a *contaminating* influence. A land use decision cannot be held to be irrational "simply because" the decision *coincides* with the views of local residents. If a project is going to affect the character of an area, and the neighbors point that out to the city council, the council is hardly acting irrationally if it considers the change when making its decision. But this is quite different from letting the fact of the opposition *substitute* as a rational basis for the decision.

The second case relied on by the city here is *Mira Development Corp.* v. *City of San Diego, supra*, 205 Cal.App.3d 1201. In *Mira Development Corp.*, a developer sought to build a 145-unit apartment project on land zoned to allow only 1 single-family dwelling unit for a quarter of an acre. The city planning department recommended approval of the rezoning. When the application came before the city council, however, various residents pointed out the project would exacerbate density in an area which already had three large apartments, overcrowded schools, inadequate playgrounds and parks, and a hazardous traffic problem.

On appeal the court contrasted the prior approval of the planning commission and other city agencies with the opposition voiced by the residents. The court stated, "[i]t was the city's prerogative to give greater weight to the statements of those directly affected by the development—i.e., the residents . . ."—than the planning agencies which had recommended approval. (205 Cal.App.3d at p. 1216.) This statement cannot be read to suggest the residents' opposition, by itself, was sufficient to justify denial of the rezoning application. At most, the court was indicating the city could give greater weight to the merits of the residents' concerns than it gave to the merits of the planning agencies' concerns.

The final case relied on by the city, *Ensign Bickford Realty Corp.* v. *City Council, supra*, 68 Cal.App.3d 467, concerned a developer's attempt to construct a shopping center the city council would not permit until the area was further developed. The council denied the developer's request to rezone the property from residential to commercial. The developer then charged the city was trying to give a monopoly to another area of town. In discussing the propriety of the council's decision on the rezoning request, the court noted: "There was testimony at the hearing from residents within the affected area that rezoning would have a deleterious impact on the surrounding property and the general neighborhood. The [trial] court erred in concluding that the council's action was improperly motivated solely from economic considerations relating to competition." (68 Cal.App.3d at p. 478.)

The language and context of this statement focus on the motivation of the city council. The council acted, at least in part, because of reasons articulated by residents (i.e., the "deleterious impact on the surrounding property")

rather than "solely" out of a desire to create a monopoly. The statement cannot be reasonably read to suggest the mere fact of the residents' opposition was enough to justify the council's action.

The authority cited by the city simply does not support its position. The law is actually quite contrary. As stated in *Benner* v. *Tribbitt* (1948) 190 Md. 6 [57 A.2d 346], a case discussed in detail in *Mettee*, "[I]n restricting individual rights by exercise of the police power neither a municipal corporation nor the state legislature itself can deprive an individual of property rights by a plebiscite of neighbors . . . . Such action is arbitrary and unlawful . . . ." (57 A.2d at p. 353.)

## C

■ Finally, the city argues this case is moot because it amended its general plan after the Rosses filed their complaint to lower the allowable density in the five large lots to just one house per acre.[4] The city's logic goes like this: An appellate court must apply the law in existence at the time of its decision. The new general plan is in effect now so this court must apply it. Moreover, the Rosses did not yet have a building permit when the plan was enacted, and such a permit is necessary to have a constitutionally recognizable "property right." Not having such a property right, the constitutional rule against laws depriving individuals of their property rights retroactively has no effect in this case. At the same time, Government Code section 65860 requires a city's zoning ordinances to be consistent with its general plan. Because the Rosses did not amend their pleadings to attack the amendment to the general plan, and the statute of limitations (Gov. Code, § 65009, subd. (c)(1)) has already run, they cannot challenge the plan amendment now. Therefore, the case is moot because the city is now unable to rezone the property consistent with its general plan, which itself is now invulnerable to attack.

The city's argument founders because its premise is faulty. The plan amendment does not "apply" to—meaning, have a legal effect on—the Rosses' property under the circumstances of this case.

The city's "applicability" argument is based on a passage in *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 125 [109 Cal.Rptr. 799, 514 P.2d 111]. In *Selby Realty*, a property owner sought to build a 54-unit apartment building on land which the city plan designated for a street extension. The city denied a building permit because the owner would not dedicate the street extension included in the plan. (10 Cal.3d at pp. 115-116.)

---

[4]One of the five large lots affected by the plan amendment is less than a full acre.

The owner sued the city. One of the owner's causes of action was based on the city's lack of authorization under its own code to deny the building permit. The owner contended the *only* authorization for the city to deny a building permit was a determination under a particular section of the city code that the proposed building would depreciate property values in the neighborhood. (10 Cal.3d at p. 123.)

The trial court sustained the city's demurrer, and the owner appealed. By the time the case reached the Supreme Court, the city had amended another section of its code to allow building permits to be conditioned on the dedication of a right-of-way if the city manager found the proposed improvement would cause an increase in traffic requiring an additional right-of-way. (10 Cal.3d at pp. 124-125.) Even with this amendment, however, the Supreme Court reversed the trial court, holding the owner had stated a cause of action based on the city's having abused its discretion in denying the permit. (10 Cal.3d at p. 125.)

The Supreme Court then turned its attention to the issues the trial court would face on remand. The court said the amended code section would apply to the owner's request for a building permit even though it came after the denial of the permit. (See 10 Cal.3d at p. 126.) As authority for its conclusion, the court cited a treatise on zoning law, 3 Anderson, American Law of Zoning (1968) page 599, for the following statement: "It is the prevailing rule that a reviewing court will apply the law in existence at the time of its decision rather than at the time the permit was denied." (10 Cal.3d at p. 125.) It is this rule the city relies on to establish the plan amendment applies to the Rosses.

But this is not all *Selby Realty* had to say on the subject. In a footnote, the court acknowledged the existence of two lines of seemingly inconsistent California cases concerning applications for building permits when the law changes before a decision on appeal. The court reconciled the two lines by noting the cases holding the new law "inapplicable" did so because the new "enactment stemmed from an attempt to frustrate a particular developer's plans." (10 Cal.3d at p. 126, fn. 11; see also *Atlantic Richfield Co.* v. *Board of Supervisors* (1974) 40 Cal.App.3d 1059, 1064, fn. 3 [115 Cal.Rptr. 731].)

A similar idea is contained in the latest edition of the Anderson treatise, which acknowledges a "bad faith" exception to the general rule of applicability of the law as it exists at the time of the appellate decision: "Courts that normally apply the law as it exists on the day of final decision *will not apply an amendment adopted in bad faith* or for the purpose of delay." (4 Anderson, American Law of Zoning (3d ed. 1986) § 27.38, p. 595, fns. omitted, italics added.)

Here, we cannot imagine a more obvious attempt to "frustrate a particular developer's plans." (See *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d at p. 126, fn. 11; accord, *Gabric* v. *City of Rancho Palos Verdes* (1977) 73 Cal.App.3d 183, 202-203 [140 Cal.Rptr. 619] [refusing to apply new height limit ordinance enacted after owner's request for building permit for two-story house].) The city's own records reflect the plan amendment was precipitated by the very rezoning request now before this court. The plan amendment isolates the Rosses (and the two of their neighbors to whom the plan amendment might make a difference) as the special objects of legislative action. This itself is constitutionally impermissible. (*Sunset View Cemetery Assn.* v. *Kraintz* (1961) 196 Cal.App.2d 115, 124 [16 Cal.Rptr. 317], quoting *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356, 373-374 [30 L.Ed. 220, 227-228, 6 S.Ct. 1064].) It also attempts to retroactively justify a decision which was wrong in the first place, a gambit condemned in *Gabric* v. *City of Rancho Palos Verdes, supra,* 73 Cal.App.3d at page 203: "The new ordinance cannot be used as a rationale or means to affirm a wrong decision."

The city incorrectly denied the Rosses' request for rezoning. The plan amendment is nothing more than the city's attempt to tie its own hands so it supposedly cannot be ordered to do now what it should have done in the first place. We untie the city's hands by holding the plan amendment inapplicable to the Rosses' rezoning request.

IV

CONCLUSION

The Rosses' lot was the object of discriminatory spot zoning. The judgment of the trial court is affirmed.

Sonenshine, J., and Crosby, J., concurred.