**Kingo KAWAOKA and Tatsumi Kawaoka, Plaintiffs,**

v.

**The CITY OF ARROYO GRANDE, the City Council of Arroyo Grande, Mark M. Millis, B'Ann Smith, Gene Moots, A.K. Dougall, Doris Olsen, Defendants.**

No. CV 90–4465 Kn (Ex).

United States District Court,
C.D. California.

April 30, 1992.

---

John B. Murdock, Santa Monica, Cal., for plaintiffs.

Judy Skousen, City Atty., City of Arroyo Grande, Katherine E. Stone, Margaret Moore Sohagi, Philip A. Seymour, Freilich, Stone, Leitner & Carlisle, Los Angeles, Cal., for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

KENYON, District Judge.

The Court, having received and considered both defendants' and plaintiffs' motions for summary judgment, and the papers filed in support thereof and opposition thereto, GRANTS defendants' motion for summary judgment and DENIES plaintiffs' motion for summary judgment.

In making these rulings, the Court makes the following findings of fact. For approximately 38 years, plaintiffs have owned and primarily farmed 35 acres of strawberry fields located along the southern border of Arroyo Grande. Adjacent to plaintiffs' parcel are 20 additional acres under three separate ownerships, some of which have also been used for strawberry farming. From October of 1990 to July of 1991, plaintiffs leased the farmable portion of their land (28 acres) to a company that continued to grow strawberries on the property. Plaintiffs' land is currently leased to a third-party who is attempting to farm cabbage, although the land remains cultivated for strawberries.

In 1988, the City began to update its general plan, a comprehensive, land-use planning device required of every city by state law. Cal.Govt.Code §§ 65300–65359. After preparing numerous workshops, interviews, public opinion surveys, interviews, and public hearings, and informing the public of proposed general plan changes, the City arrived at a revised general plan, the primary goal of which is to preserve the town's traditional rural and agricultural atmosphere.[1]

In accordance with the general plan objectives, the City designated large portions of land for continued agricultural use, including the subject 55 acres. However, in response to concerns regarding the long-term viability of agriculture on the parcel, the City added to the draft general plan Land Use Element Policy 1.5, which states:

"At such time as they are no longer economically viable, permit the conversion of the existing strawberry fields located south of Grand Avenue near the western city limits to urban use subject to preparation of a specific plan as set forth in Government Code Sections 65450–65457 ...

a. If converted, utilize the northerly portion of the property adjacent to Grand Avenue for commercially-related uses.

b. If converted, utilize the southerly portion of the property for single family residential (less than 5.0 dwelling units per gross acre) and rural residential (less than 2.0 dwelling units per gross acre) uses."

Beginning April 9, 1990, the City Council initiated hearings to review the draft general plan. Plaintiffs, represented by their consultant Burtram Johnson ("Johnson"), appeared at several of these hearings to present evidence that agriculture is not economically viable on the subject property and to request the conversion of the property from an agricultural to a residential designation. Plaintiffs also lodged an objection to the Policy 1.5 specific plan requirement.

In response to plaintiffs' requests, the City Council changed the land use designation of all 55 acres. The 20 acres surrounding the plaintiffs' plot were converted from agricultural to residential and/or commercial. Plaintiffs' property was divided into

---

1. The general plan states; "It is the fundamental goal of the City of Arroyo Grande to achieve a community which: [p]romotes a rural, small town atmosphere and retains Arroyo Grande's traditional ties to agriculture[,] [r]ecognizes limitations upon the natural resources necessary to support urban and rural development, and lives within those limits[,] [and] [a]ccomodates a balance and variety of urban and rural lifestyles ..."

two residential classifications; the northern portion was designated "SF" (single family, 4.5 units per acre maximum) while the southern portion was designated "RR" (rural residential, 1.0 unit per acre maximum). In addition, the City Council maintained the specific plan requirement for all 55 acres.

On May 22, 1990, the City both adopted the general plan update by a five to zero vote and enacted a 45 day water moratorium imposing restrictions on some development applications within the City.[2] Then, on June 26, 1990, the City Council extended the water moratorium by ten months and 15 days, to expire by its own terms in May of 1991.

After the adoption of the general plan, Lee Webb ("Webb") offered to buy plaintiffs' land for $3,735,000, although he quickly retracted the offer upon learning that any development of the land would require the submission of a specific plan. The record indicates, however, not only that plaintiffs did or would have rejected the $3,735,000 offer, but also that they subsequently declined to advertise the property or list it on any real estate exchange, in spite of their intent to sell the property for development.

In addition, at no time during the relevant period did plaintiffs either prepare (or ask the City to prepare) a specific plan for their property or file a formal zone change or development application. Although plaintiffs claim the lack of available application procedures accounts for their inaction, on May 14, 1991, approximately one year after the adoption of the general plan, the City passed the Arroyo Grande Development Code, including procedures for adopting and amending specific plans.

### I. Summary Judgment Legal Background

◼ According to FRCP 56(c), a court shall grant summary judgment if there is enough information on the record to show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party has the initial burden of proving, based on the total record, an absence of genuine factual issues for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the nonmovant must present concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson v. Liberty Lobby,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In addition, expert affidavits must be countered by expert affidavits in order to create a triable issue of fact. *Jones v. Wike,* 654 F.2d 1129, 1130 (5th Cir.1981). Finally, "[n]either a desire to cross-examine an affiant nor an unspecified hope of undermining his/her credibility suffices to avert summary judgment." *National Union Fire Ins. Co. v. Argonaut Ins. Co.,* 701 F.2d 95 (9th Cir.1983).

### II. Whether the Instant Action is Ripe for Review

◼ In the Ninth Circuit, a challenge to a land-use regulation is unripe until the property-owner submits at least one meaningful application for development. *Southern Pacific v. City of Los Angeles,* 922 F.2d 498 (9th Cir.1990); *Herrington v. County of Sonoma,* 857 F.2d 567 (9th Cir. 1988) [Referring to the ripeness finality requirement, the court noted, "[a] final decision requires at least: '(1) a rejected development plan, and (2) a denial of a variance.'"] In addition, "a landowner may need to resubmit modified development proposals that satisfy the local government's objections to the development as initially proposed." *Del Monte,* 920 F.2d 1496, 1501. Finally, although the *Southern Pacific* court does elaborate on a "futility exception" exception to the general rule, "[t]he futility exception does not alter an owner's obligation to file one meaning-

---

**2.** The City made the following findings in support of its water moratoria. As of May 1990, reliable City water supplies totaled 3,492 acre feet per year. To grant all development applications authorized as of that time would require between 4,415 and 4,611 acre feet per year. Even considering conservation measures, permitting all development applications to proceed would result in a shortfall of 637 to 833 acre feet per year.

ful development proposal." *Southern Pacific*, 922 F.2d 498, 504; *Herrington v. County of Sonoma*, 857 F.2d 567 (9th Cir. 1988), *accord Del Monte Dunes v. City of Monterey*, 920 F.2d 1496 (9th Cir.1990).

■ Because plaintiffs here never submitted any formal development application, failing to meet the Ninth Circuit threshold requirement for finality, the instant action does not appear ripe for this Court's review. Although plaintiffs' repeatedly argue that government action violates substantive due process at the moment the harm occurs, rendering their action ripe upon the adoption of the updated general plan, they fail to realize that for their "as applied" challenge, a showing of injury requires, at the very least, one application for development.

Plaintiffs also argue that both the City's one year water moratorium and its one year lag in passing a formal Development Code excessively delayed the development of plaintiffs' property. Their argument fails for two reasons. First, neither the water moratorium, which did not prevent landowners' from filing specific plan applications, nor the City's delay in passing its Development Code, which arguably only supplemented already sufficient specific plan procedures, excused plaintiffs' failure to make a formal development application. Second, to the extent that specific plan application procedures were unavailable in 1990, the City's one year delay in passing the formal Development Code was not unreasonable. *Agins*, 447 U.S. 255, 262, n. 9, 100 S.Ct. 2138, 2143 n. 9 ("[m]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership."). In *Zibler v. Town of Moraga*, 692 F.Supp. 1195, 1207 (N.D.Cal.1988), the Ninth Circuit found that "a one-and-a-half-year development moratorium in order to develop a comprehensive scheme for regulating open space seems neither unreasonable, nor, standing alone, sufficiently burdensome to require compensation." Moreover, under California Government Code § 65858, a legislative body may adopt for as long as two years an interim urgency measure prohibit-

ing uses which may be in conflict with a general plan.

Therefore, because plaintiffs failed to utilize their clear opportunity to file an application for development, the instant action appears unripe. Even if ripe, however, plaintiffs' challenge still fails on the merits of its substantive due process and equal protection causes of action.

### III. Plaintiffs' Substantive Due Process Cause of Action

#### A. Standard of Review

"To establish a violation of substantive due process, the plaintiffs must prove that the government's action was clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Sinaloa Lake Owners Assn. v. Simi Valley*, 882 F.2d 1398, 1407 (9th Cir.1989). Furthermore, "[i]n adjudicating substantive due process challenges to zoning ordinances, a court asks only whether a *conceivable* rational relationship exists between the zoning ordinance and legitimate governmental ends." *Smithfield Concerned Citizens v. Town of Smithfield*, 907 F.2d 239, 245 (1st Cir.1990); *Lockary v. Kayfetz*, 917 F.2d 1150 (9th Cir.1990).

#### B. Whether the City's Actions Served Legitimate Governmental Ends

■ The City was pursuing legitimate governmental goals when it initiated the process of updating its general plan. Protecting the environment, preserving open space and agriculture, and regulating the quality of a community by limiting development are all legitimate public ends. *Agins v. Tiburon*, 447 U.S. 255, 261, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106 (1980) [the development of local open space plans], *Smithfield Concerned Citizens*, 907 F.2d 239, 244–245 ["controlling both the rate and character of community growth is the very purpose of land use regulation"], *Barancik v. County of Marin*, 872 F.2d 834, 837 (9th Cir.1988). As mentioned above, the City's stated goals in revising its general plan were to preserve a small-town agricultural community, to accommodate a mix of residential densities, and to limit devel-

opment in accordance with available resources. Although plaintiffs claim the City's actual motivations were racially-oriented and belied the official goals of the General Plan, plaintiffs fail to substantially support their assertion with evidence on the record. Therefore, under the relevant case law, the purposes of the City's land-use decisions and actions are clearly legitimate.

C. Whether the City's Regulatory Actions Were Conceivably Rational Means of Accomplishing its Legitimate Stated Goals

1. *The Specific Plan Requirement*

■ There exists a conceivably rational relationship between the City's imposition of a specific plan requirement on the subject 55 acre parcel, as well as on other town properties, and the City's regulatory goals. Article 8 of the California Government Code, "Specific Plans," specifically authorizes and defines the scope of specific plans. Section 65450 of the article states that specific plans are "for the systematic implementation of the general plan for all or part of the area covered by the general plan." Specific plans are to accomplish this implementation by coordinating the infrastructure (sewage, transportation, etc.) of local areas. Cal.Govt.Code § 65451. Therefore, the City's act of requiring a specific plan for the development of the 55 acres at issue is clearly a conceivably rational means of attaining its larger community goals.

Plaintiffs, however, argue that the absence of any specific plan application procedures, fee schedules, or guidelines, as well as the subsequent year-long delay in developing such a program, excuses their inaction and renders the requirement itself arbitrary and irrational. As argued in the ripeness section, however, plaintiffs are nevertheless unjustified in failing to submit at least one application for development. In addition, the case law suggests that a one year delay is by no means unreasonable. Finally, plaintiffs' claim that *no* specific plan procedures existed at the relevant time is not entirely accurate. Although the

City did not pass the Arroyo Grande Development Code code until May of 1991, California Government Code §§ 65450–65457 establish guidelines as to what a specific plan (application) must contain. The updated General Plan itself also provides insight into the general planning policies plaintiffs would be required to consider.

Plaintiffs also assert that the City's specific plan requirement forces them to act jointly with their neighbors on the 55 acre tract and is therefore arbitrary and unreasonable. To support their "joint action" claim, they rely on *Sederquist v. City of Tiburon*, 765 F.2d 756 (9th Cir.1985), which dealt with a City joint action requirement in an illegal subdivision. Unlike subdivisions, however, specific plans require no joint action on the part of property-owners. Nothing in California law, which very clearly authorizes the specific plan as a land-use planning tool, requires the plaintiffs to act in concert with their neighbors. In fact, what *Sederquist* questioned was not a city's ability to "require 'proper planning' for utilities, roads, sewers, etc. before a home can be built," but only the propriety of requiring property-owners in an illegal subdivision to act jointly to achieve such ends. *Sederquist*, 765 F.2d 756, 761. Therefore, plaintiffs' joint action argument is unpersuasive.

2. *The City's Re-designation of Plaintiffs' Property*

■ The City's act of converting plaintiffs' land from an agricultural designation to a medium-density residential classification (sections of 1.0 and 4.5 units per acre) certainly is rationally related to the twin goals of preserving a rural community and permitting development only in accordance with available resources. Plaintiffs' redesignation appears both to promote a small-town atmosphere and to permit development only to the extent allowable by the region's infrastructure and resources. In the *Smithfield* decision, for instance, 4.6 and 2.6 acre minimum parcel sizes were rationally related to the government's broad public safety and welfare goals, regardless of whether the government's action was the most effective way of achiev-

ing such goals. Despite the fact that they received a designation that permits 83 units on 35 acres in a traditionally rural region, plaintiffs attempt to argue that the City's rezoning decision is arbitrary and irrational.

Preliminarily, plaintiffs suggest that the City's density requirement is not only less than densities in neighboring cities, but also is actually motivated by an anti-development bias, not by resource constraints. Defendants respond effectively with the following arguments: (a) plaintiffs never raised this "density" argument in their original amended complaint, (b) plaintiffs fail to provide legal support indicating that Arroyo Grande must imitate the land-use decisions made in other cities, and (c) plaintiffs supply no evidence of illicit motive sufficient to outweigh the deference due the City's findings regarding available resources and advisable development.

■ Plaintiffs also claim the effect of the City's density decision was to "spot zone" their property. In support of their position, plaintiffs rely only on two *state* court cases, *Hamer v. Town of Ross*, 59 Cal.2d 776, 31 Cal.Rptr. 335, 382 P.2d 375 (1963) and *Ross v. City of Yorba Linda*, 1 Cal.App.4th 954, 2 Cal.Rptr.2d 638 (1991), which involve plaintiffs with plots of land restricted to a maximum density of one unit/acre though surrounded by parcels of lesser size. Plaintiffs' attempt to analogize these spot-zoning cases is unavailing for three reasons. First, unlike the state cases *supra*, plaintiffs' 35 acre tract cannot be considered a "spot." "Spot zoning is '[w]here a *small* parcel is restricted and given less rights than the surrounding property ...'" (emphasis added) *Ross*, 1 Cal.App.4th 954, 2 Cal.Rptr.2d 638 (1991). Second, plaintiffs fail to provide the Court with adequate information as to the the specific densities permitted in the surrounding parcels, leaving the Court without

means by which to draw comparisons. Third, plaintiffs again have raised a cause of action that they failed to plead in their original complaint.

Finally, plaintiffs repeatedly attempt to argue that, although the City has already redesignated their land (there is no factual disagreement here), the literal language of the adopted general plan still requires plaintiffs to make a showing that the continued agricultural use of their land is economically non-viable. Although the adopted general plan does, technically, contain a provision about proof of economic non-viability in Policy 1.5, plaintiffs' claim fails for several reasons.

As stated in the declarations of City Attorney Judy Skousen ("Skousen"), planning consultant Lloyd B. Zola ("Zola"), and City Planning Director Doreen Liberto–Blanck ("Liberto–Blanck"), the City *did* accept plaintiffs' request for a zone change, thereby clearly and implicitly accepting their argument that agriculture is no longer viable on the subject property.[3] It is also clear from the minutes of the April 25, 1990 City Council meeting that the City Council accommodated plaintiffs' request.[4] Plaintiffs, in other words, got at least part of what they wanted; the City accepted their original proof of economic non-viability and required nothing more.

■ Plaintiffs' are also misguided in their claim that the adopted general plan is unconstitutionally vague as a result of its apparent requirement that they prove economic non-viability for a second time. A general plan is not a *law*, but a tentative *plan*, subject to change. *Selby Realty Co. v. City of San Buenaventura*, 10 Cal.3d 110, 109 Cal.Rptr. 799, 514 P.2d 111 (1973). It seems inappropriate to consider a general plan unconstitutionally vague when a general plan is, by definition, general. Therefore, plaintiffs' unconstitutional

---

3. Liberto–Blanck declares, "It is my understanding that the Kawaokas do not have to show the City of Arroyo Grande that agriculture is no longer economically viable before converting from an agricultural use to a residential use. The Kawaokas property is designated residential under the general plan."

4. With reference to the 55 acre lot, the minutes state, "After additional discussion it was moved by Olsen/Smith and the motion carried to accept the staff's recommendation of commercial, single family and rural residential designations with a specific plan."

vagueness claim, which again never appeared in their original complaint, is unconvincing.

### 3. *The City's Imposition of a Temporary Water Moratorium*

■■■ Plaintiffs' argument that the City's approximately year-long water moratorium (1990–91) was part of its concerted effort to halt the development of plaintiffs' property, contributing to their financial demise, is barely relevant at best.

The water moratorium argument has a weak connection to the causes of action plaintiffs pleaded originally. It expired in May of 1991, rendering moot any subsequent claim for declaratory or injunctive relief. Moreover, there is virtually no connection between the moratorium and plaintiffs' claim for damages. Any failure to develop during 1990–91 was due not to the moratorium but to plaintiffs' own failure to submit either a specific plan or an application for a moratorium exemption.[5]

In addition, plaintiffs are unsuccessful in their attempt to analogize the instant case to *Lockary v. Kayfetz*, 917 F.2d 1150 (9th Cir.1990), which held there were triable issues of fact as to whether the city's enactment of a moratorium on new water hookups for undeveloped land was arbitrary and selective. Plaintiffs in *Lockary* presented affidavits showing that after the moratorium was imposed, water use increased 70%, the city voluntarily provided water for secondary uses such as swimming pools, and third parties situated similarly to plaintiffs received water while plaintiffs did not.

In contrast, plaintiffs here present insufficient evidence that the water moratorium was pre-textual and targeted specifically toward thwarting the development of their property. Plaintiffs' best evidence is Craig Kawaoka's declaration that, according to *his* water consumption records, his family would consume less water in development than in agriculture. Plaintiffs also occasionally argue that the City's findings of a

water shortage fail to consider the fact that agriculture requires more water than does land-development. Without supporting affidavits from a water-use expert to reliably controvert City findings, however, plaintiffs' claims are unavailing. Plaintiffs have not provided this Court any basis to consider the City's water moratorium anything but a conceivably rational response to a water shortage. As Zola states in his declaration, the moratorium was necessary because the City did not have enough water to accommodate the development permitted under the updated general plan (see footnote 2).

Therefore, plaintiffs' attack on the moratorium is not only myopic (in that it focuses primarily on the sufficiency of water levels for the development of *plaintiffs'* property), but also largely irrelevant given that the City granted plaintiffs' request to develop their property, albeit at more moderate densities than requested.

### A. The City's Actions are Presumed Valid; Plaintiffs' Attempts to Attack Studies and Credibility of Witnesses are Unavailing

■■■ City legislative acts, including the general plan update, are presumed valid. *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1577 n. 14 (11th Cir.1989). The City is not required to justify its actions with specific evidence or documented reports. "Although such planning and study are doubtless desirable, due process does not require a legislative body to perform any particular studies or prepare any particular analysis to justify its decisions." *Smithfield*, 907 F.2d 239, 245. Moreover, as mentioned *supra*, a general hope of undermining the credibility of witnesses is not sufficient to avoid summary judgment. *National Union Fire Ins. Co.*

As a result, plaintiffs' varied attempts to subvert the studies, findings, and testimony of defendant council members and witnesses are unpersuasive. Plaintiffs specifically allege the following; that Mayor Mark M. Millis, City Engineer Paul Karp,

---

**5.** The moratorium temporarily halted new development applications, but not applications for    specific plans.

Deputy Public Works Director Lampitoc, Long Range Planner Sandra Bierdzinski, and Planning Director Doreen Liberto–Blanck collectively displayed confusion in their depositions and miscellaneous statements about economic non-viability, the water shortage, the necessity of a specific plan, the ability of the infrastructure of the 55 acres at issue to accommodate increased development, and the validity of the studies underlying the City's actions. However, haphazard attacks on both the competence of various City-members' and the validity of City findings do not seriously challenge the deference due City's actions, which need only have a conceivable rational basis to withstand a substantive due process claim.

### D. Whether City Actions Unduly Burdened Plaintiffs

■ Plaintiffs claim that the City's specific plan requirement, delay in adopting specific plan procedures, water moratorium, and density redesignation collectively diminished the value of plaintiffs' land and resulted in lost sales and/or profits. Specifically, plaintiffs claim that while Webb was originally willing to purchase the tract for $6,000,000 (contingent upon a 5.0 unit/acre zoning redesignation), when he learned that such a density was unlikely, he lowered his offer to $3,735,000. Despite a discrepancy as to whether Webb subsequently retracted his second offer, or whether plaintiffs merely rejected it, plaintiffs have fallen far short of showing undue oppression.

#### 1. Plaintiffs' Entitlement to a Particular Zoning Density

■ To support an undue burden claim, plaintiffs must preliminarily show they have a protected property interest in a particular zoning density. " 'In the context of a zoning dispute, to state a claim under the fourteenth amendment for deprivation of 'property' without due process of law a person must establish that he had a valid 'property interest' in some benefit that was protectible under the fourteenth amendment at the time he was deprived of the benefit.' " *Brady v. Town of Colchester,*

863 F.2d 205, 211–212 (2nd Cir.1988). Plaintiffs, however, fail to make such a showing, citing cases that involve only takings, procedural due process, or plaintiffs who had gone through all necessary channels to create legitimate claims of entitlement (here, plaintiffs never took the necessary step of filing any kind of development application). More importantly, the Ninth Circuit has held that land-owners have no right to the highest, best, and most profitable use of their land. *William C. Haas v. City & Cty. of San Francisco,* 605 F.2d 1117 (9th Cir.1979).

#### 2. Plaintiffs' Lost Profits, Lost Sales, and Financial Plight

Despite plaintiffs' claim that City actions resulted in as much as a $6,000,000 loss in land-sale profits, the Supreme Court has held that potential profitability is not a strongly protected property interest: "Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests." *Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979). The *Andrus* rule applies quite forcefully to the instant plaintiffs, whose failure either to actively market the subject property or to file any kind of development application renders their claim of right to lost profits untenable.

■ Similarly, plaintiffs' fail in their assertion that the City's water moratorium and delay in developing specific plan procedures made development in 1990–91 impossible, creating a substantive due process violation. "Mere fluctuations in value during the process of governmental decision-making, absent extraordinary delay, are 'incidents of ownership.' " *Agins,* 447 U.S. 255, 262, n. 9, 100 S.Ct. 2138, 2143 n. 9. Here, the City's measures were short and reasonable, especially since they did not affect plaintiffs' ability to begin the development application process.

Finally, plaintiffs' repeated claims of financial plight are irrelevant. Although it may be true that plaintiffs are in a financial bind, such hardship is immaterial to this Court's decision. *Park Ave. Tower Associates v. City of New York*, 746 F.2d 135, 138–40 (2d Cir.1984).

### IV. Plaintiffs' Equal Protection Cause of Action

#### A. Standard of Review

"Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest." *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–2517, 49 L.Ed.2d 511 (1976). Zoning and land-use issues do not implicate fundamental rights. *Christian Gospel Church v. San Francisco*, 896 F.2d 1221, 1225 (9th Cir.1990). Therefore, absent a showing of invidious race or class-based discrimination, a government action violates equal protection only if it contains a classification "so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *New Orleans*, 427 U.S. 297, 303–305, 96 S.Ct. 2513, 2516–2517. To satisfy this low-scrutiny test, plaintiffs must show their property has been treated differently than other similarly situated property, and that there is no rational basis for such differential treatment. *Jacobs, Visconsi & Jacobs v. City of Lawrence*, 927 F.2d 1111 (10th Cir.1991).

#### B. Whether the City's Actions Evidence Invidious Racial Discrimination

To invoke high scrutiny, plaintiffs must show the following: that the City *intentionally* discriminated on the basis of race and that a racially-neutral decision-making process would have led the City to a different result. *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 264–265, 270, 97 S.Ct. 555, 563, 566, 50 L.Ed.2d 450 (1977). Allegations, feelings, and bare assertions are insufficient for this showing. *Celotex Corp.*, 477 U.S. 317, 106 S.Ct. 2548.

#### 1. Former Council Member Olsen's Alleged Discriminatory Remark

Plaintiffs' primary claim for intentional racial discrimination is that former council member Olsen allegedly made the following remark to plaintiffs' real estate agent and/or her assistant outside the context of City Council business: "Why should those Japanese people make all that money?" Although defendants deny in numerous declarations that Olsen ever would have made such a statement, plaintiffs argue that her statement somehow indicates a bias that affected the City Council's actions regarding the subject property. Olsen's statement, however, is insufficient for a showing of intentional racial discrimination.

In *FDIC v. Henderson*, 940 F.2d 465 (9th Cir.1991), the former president of a minority-owned bank sued federal bank regulators, whose actions allegedly resulted in his being fired by the bank's board of directors. Although the record there showed sufficient rational reasons for the regulatory action, plaintiff claimed he was a victim of racial discrimination. In support of his claim, plaintiff pointed to several alleged statements by the chief bank regulator (one of which the court considered could evidence a discriminatory intent). Nevertheless, the Court upheld summary judgment for the defense, finding that plaintiff failed to produce ample evidence to create a genuine factual issue as to the chief regulator's intentions. Similarly, in the instant case, which involves only one far more marginal statement, plaintiffs have not made a sufficient showing of discriminatory intent. In fact, it is possible that Olsen's alleged remark could be construed not as racist but as merely descriptive, albeit insensitive and unsophisticated.

Standing alone, such a statement is also insufficient to show that the *City* acted with the intent to discriminate. Regardless of whether the statement itself is facially

discriminatory, plaintiffs provide no evidence of any controversial statements by other council members. Moreover, the City may only be held liable where plaintiffs' injury stems from official city policy, not merely the alleged, off-duty statements of a single council member. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The City actions and policies cannot be considered racially motivated where there is no evidence of discriminatory intent on the part of four of the five council members. The Ninth Circuit addressed the same issue in *Lake Nacimiento Ranch Co. v. County of San Luis Obispo*, 841 F.2d 872 (9th Cir.1987), where the plaintiff claimed the decision of the board of supervisors was tainted by the bias of an individual board member. The court found there, as here, that an individual board member has no authority to unilaterally establish official group policy.

Plaintiffs are also unable to show that the City would have come to different decisions in the absence of Olsen's alleged motivations. Plaintiffs present no evidence showing impure motivations on the part of the rest of the City Council, which voted unanimously to act upon Olsen's proposal to change the land at issue to a residential designation. Without any affidavits to the contrary, this Court must presume that the remaining City Council members based their decisions on rational and legitimate concerns.

2. *Potential Unfavorable Treatment of Japanese Americans at City Council General Plan Update Hearings*

Although plaintiffs actually received most of the residential designation they requested, they nevertheless maintain that the City granted other property-owners their full requests. Again, however, while plaintiffs merely make a sweeping assertion, the City supports its response that it answered rezoning requests in a number of

ways, all based on the particular circumstances of each case. The minutes of the April, 1990 general plan update hearings show that the City Council received a variety of requests and very often acted in accordance with the recommendations of the Planning Commission. Considering that plaintiffs did receive a residential redesignation, and considering that other (non-Japanese) citizens with similarly large tracts of land were *denied* a conversion from agriculture, plaintiffs' claim that Japanese–American property owners received singularly unfavorable treatment at the hearings is unsubstantiated.

3. *The Racially Discriminatory Content of the Specific Plan Requirement, the Adopted General Plan, the Zoning Redesignation, and the Water Moratorium*

Finally, plaintiffs are unable to prove that any of the City's measures contained a racially discriminatory intent. The specific plan requirement is discriminatory neither on its face [6] nor in application.[7] The adopted general plan, as well as its provision for the rezoning of plaintiffs' property, also betrays no intent to discriminate. Finally, on its face, the water moratorium, as mentioned *supra*, applied to all citizens and races equally. In application, there is no evidence that the City imposed the moratorium as an attempt to intentionally discriminate against plaintiffs or against Japanese–Americans as a class.

C. Whether the City Exhibited any Differential Treatment of Similarly Situated Property

▆ Because plaintiffs are unable to prove the City had any intent to discriminate on the basis of race, this Court should apply a low-scrutiny test, the first prong of which is to decide whether the City treated similarly situated property differently. Plaintiffs point to none, claiming only, for instance, that the City granted the rezoning request of a large apartment complex

---

**6.** There is no reference to race either in Cal. Govt.Code §§ 65450–65457 or in the specific plan provisions of the general plan.

**7.** In its exhibits, the City shows that it not only imposed a specific plan requirement on the

three other property-owners in the 55 acre tract, but also imposed either a specific plan or planned development (similar to a specific plan) on at least six other properties in the town.

on a town hillside. It is fatal to plaintiffs' assertion that they can cite no large tracts of agricultural land, with similar resources and capacities for development, which received significantly better treatment. The only tract of land plaintiffs identify as similarly situated is the remaining 20 acres on the 55 acre plot, which also received a specific plan requirement in order to coordinate the development and infrastructure of the entire region. Therefore, plaintiffs fail to satisfy the first prong of the low-scrutiny test.

### D. Whether there is a Rational Basis for any Differential Treatment of Similarly Situated Property

██ It is unnecessary to analyze this second prong of the test since plaintiffs' preliminary showing was inadequate. However, even if plaintiffs had proven there were properties similarly situated which received differential treatment, it is clear the City's objectives in any such treatment would have been rational. Zola's declaration indicates that the City based plaintiffs' rezoning decision on a "need to plan roads, coordinate sewage disposal, roadways, easements, drainage, utility services and to distribute available water supplies and sewage capacity." In addition, the density decision manifestly serves the general plan's twin goals of preserving agriculture and accommodating limited development.

### V. Whether the Individual Council Members are Immune from Liability

██ Whether the individual council members are immune to suit depends on whether their actions in this case are considered legislative or adjudicative in nature. *Harris v. County of Riverside*, 904 F.2d 497 (9th Cir.1990). According to *Kuzinich v. County of Santa*, 689 F.2d 1345, 1349–1350 (9th Cir.1982), members of local legislative bodies have complete immunity from suits based on their legislative acts and qualified immunity from suits based on their executive acts.

It is well-settled that general plan, specific plan, and rezoning enactments and amendments are legislative acts in that they affect populations, not just small groups on individual grounds. *Harris; Kuzinich; City of Eastlake v. Forrest City Enterprises*, 426 U.S. 668, 673–674, 96 S.Ct. 2358, 2362–2363, 49 L.Ed.2d 132 (1976); *Yost v. Thomas*, 36 Cal.3d 561, 570, 205 Cal.Rptr. 801, 685 P.2d 1152 (1984). Therefore, under this case law, the City Council actions at issue appear to fall squarely within the category of legislative action. Plaintiffs attempt to analogize *Harris*, where the County responded to the request of a private landowner and, without notice, rezoned plaintiff's land in a General Plan Amendment. In that case, the court found that the County's decision specifically to rezone plaintiff's land was an act distinct from the general plan amendment and violated plaintiff's right to procedural due process. Plaintiffs claim that in the instant case the the City Council similarly targeted numerous parcels of land for rezoning in its general plan update process. That the City rezoned and applied specific plans to numerous parcels of land, all with proper notice, only supports the legislative nature of the City's actions. The rezoning of plaintiffs' and many other tracts of land was merely a part of an overall general plan amendment that affected the entire Arroyo Grande community. Similarly, although plaintiffs perceive the water moratorium as a measure somehow directed specifically toward impeding the development of their land, it, too, was a measure designed to affect and benefit the City at large.

Therefore, because their actions were legislative in nature, the individual council members are immune from liability.

### VI. Conclusion

Although plaintiffs have failed to support their motion for summary judgment, defendants have shown that no genuine issues of material fact remain with respect to their motion and that they are entitled to judgment as a matter of law. The following significant facts, for instance, are undisputed: that plaintiffs appeared at and

impliedly had notice of the general plan update hearings;[8] that they applied for and received a residential designation of their property; that they never formally applied for a specific plan or subdivision map; that neither the general plan, nor its specific plan requirement, classify land on the basis of race; that the City assigned a specific plan (or similar planning tool) to other property owners, including the owners of the remaining 20 acres of the subject property; that Olsen's alleged statement was made privately and off-duty; and, that there is no evidence of any similar statements or motivations by any other City Council members. In addition, if plaintiffs' action is even ripe, it fails to state either an equal protection or substantive due process claim.

Plaintiffs cite inapposite rezoning/development cases involving the denial of summary judgment motions against landowner plaintiffs. Both *Bello v. Walker*, 840 F.2d 1124 (3d Cir.1988), and *Del Monte Dunes* are cases in which the court denied a City's summary judgment motions against the plaintiffs where the City had rejected plaintiffs' development applications and where plaintiffs provided sufficient affidavits showing a trier of fact could reasonably find that such denial was arbitrary and irrational. In *Bello,* plaintiff showed City Council members who denied development permit were strongly opposed to the project and had personal animosity against one or more of plaintiff's employees. In *Del Monte Dunes*, after plaintiff had completed all requirements for a development permit, the City granted, and then abruptly denied, permission, citing vague reasons for so doing. There was also evidence that comparable property received more favorable treatment.

In the instant case, the City essentially granted plaintiffs' rezoning request, requiring only that plaintiffs' also submit a specific plan for the subject area. By failing to take any such action, plaintiffs created

for themselves the only true impediment to property development. In addition, the only evidence of improper motive on the part of the City is one disputed, off-duty statement by one council member. Plaintiffs have presented no affidavits regarding the motivations of the rest of the City Council.

The Court, accordingly, GRANTS defendants' motion for summary judgment and DENIES plaintiffs' motion for summary judgment.

IT IS SO ORDERED.

---

8. The Court finds plaintiffs had notice of the City Council hearings for at least two reasons: (a) Burtram Johnson attended at least one of the meetings, and (b) Johnson declares that he "personally insured that the April 4, 1990 materials [stating his reasons in support of the redesignation of plaintiffs' land] were hand-delivered to each councilmember prior to their hearings in late April and in May of 1990."